RECEIVED
SDNY PRO SE OFFICE
2024 MAY 30   AM 10: 25

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TROIX NELSON,

               Plaintiff,

    -against-

KATHLEEN S. THOMSON, Individually and in her Official Capacity as
Acting Deputy Commissioner, SHERRIE REMBERT, Individually and in
her Official Capacity as Assistant Chief, LOUIS A. MOLINA,
Individually and in his Official Capacity as Commissioner of Correction,
CHARISMA CARTER, In her Official Capacity as Warden,
ASIM REHMAN, In his Individual and Official Capacity as
Commissioner and Chief Administrative Law Judge, PETER TROXLER,
Union Attorney, MERCEDES MALDONADO, Union Attorney,
JOEY JACKSON, Union Attorney, JOEY JACKSON LAW, PLLC, Union
Law Firm, KARASYK & MOSCHELLA, LLP, Union Law Firm,
BENNY BOSCIO, Union President, CORRECTION OFFICERS'
BENEVOLENT ASSOCIATION, INC., Municipal Employee
Organization, and the CITY OF NEW YORK,

               Defendants.

**FIRST
AMENDED
COMPLAINT**

Civil Action No.:
23-cv-10379
(JPO) (JLC)

**JURY TRIAL
DEMANDED**

2024 MAY 24   PM 1:19

    Plaintiff, TROIX NELSON ("Plaintiff" or "Mr. Nelson"), proceeding pro se in this

action, alleges the following upon personal knowledge, except as to those allegations concerning

Plaintiff which are alleged upon information and belief. The sources of Plaintiff's information

and belief is based upon, among other things, Plaintiff's own investigation relating to his causes

of action, his pursuit of the claims in question, the Affidavit of Celia Nelson-Dean, and Labor

Relations consultation from Wayne Tatum in support of the Complaint, and Plaintiff's personal

experience of the claims in question. Plaintiff believes that further substantial evidentiary support

will exist for the allegations after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.      This action arises out of Plaintiff's removal from his position as a New York City Correction Officer, which he held by permanent appointment in the competitive class of the classified Civil Service, in violation of Section 75, Civil Service Law, and in violation of New York City Charter § 815, *inter alia.*

2.      The City of New York has a policy, practice, and custom, of violating New York State Civil Service Law section 75 in removal and other disciplinary actions taken against its Civil Service employees, to the deprivation of such employees' right to due process of law guaranteed under the Fourteenth Amendment to the U.S. Constitution.

3.      Plaintiff, a permanent civil service employee, was dismissed from service by such wrongful policy, practice and custom, perpetrated upon him by Defendant Thomson and the other named Defendants in this action.

4.      The Defendant officials in the City's Department of Correction ("DOC") perpetrated the scheme against Plaintiff by changing his employment status from permanent to probationary, by fraudulent means, and then dismissed Plaintiff from service as if he were an at-will employee, without the requisite procedural due process of law afforded to a permanent civil service employee.

5.      The Defendant Union officials and the defendant Union's law firms and their attorneys assisted the City and the defendant officials of DOC, when, *inter alia*, after being made aware that the DOC officials were taking removal action against Plaintiff in the illegal and wrongful manner such administrative action was taken in, Defendant

Union officials and the defendant Union's law firms and their attorneys took no action to stop Plaintiff's unlawful removal from service, but instead participated in the scheme.

6.    Said wrongful policy, practice, and custom, was perpetrated against Plaintiff by the Defendants to the deprivation of his right to procedural due process of law, guaranteed to him under the due process clause of the Fourteenth Amendment to the United States Constitution.

## NATURE OF THE CASE

7.    This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights, privileges, and immunities, secured by the Fourteenth Amendment to the United States Constitution; and, N.Y. Civil Service Law section 75; the Rules of the City of New York (55 RCNY, Appendix A) 5.2.7; NYC Charter §§ 621, 815(f), and 1116; and for a *Monell* Claim.

## JURISDICTION AND VENUE

8.    Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction is invoked over state and local causes of action pursuant to 28 U.S.C. § 1367.

9.    Venue is appropriate in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, occurred in this judicial district.

## PARTIES

10.    Plaintiff, TROIX NELSON (hereinafter, "Plaintiff" or "Mr. Nelson"), at all times relevant herein, was, a New York City Correction Officer, holding his position as such by permanent appointment in the competitive class of the classified Civil Service.

11.    Defendant, CITY OF NEW YORK ("City"), is a municipal corporation duly organized and doing business under the laws of the State of New York, with its principal office located at City Hall, New York, New York 10007.

12.    Defendant, KATHLEEN S. THOMSON ("Thomson"), was, the Acting Deputy Commissioner, Human Resources, and, as such, had the powers, responsibilities and duties of that position. She is sued in her individual and official capacity.

13.    Defendant, SHERRIE REMBERT ("Rembert"), was, the Assistant Chief of Administration, and, as such, had the powers, responsibilities and duties of that position. She is sued in her individual and official capacity.

14.    Defendant, LOUIS A. MOLINA ("Molina"), was, the Commissioner of Correction, and, as such, had the powers, responsibilities and duties of that office. He is sued in his individual and official capacity.

15.    Defendant, CHARISMA CARTER ("Carter"), was, the Warden, and, as such, had the powers, responsibilities and duties of that position. She is sued in her official capacity.

16.    Defendant, ASIM REHMAN ("Rehman"), was, the Commissioner and Chief Administrative Law Judge of OATH, and, as such, had the responsibilities and duties of that office. He is sued in his individual and official capacity.

17.    Defendant, PETER TROXLER ("Troxler"), was a union-retained lawyer assigned to represent Plaintiff in the disciplinary action that led to the Negotiated Plea Agreement ("NPA"), and, as such, had the responsibilities and duties to represent Plaintiff fairly and legally. He is sued in his individual capacity.

18.     Defendant, MERCEDES MALDONADO ("Maldonado"), was a union-retained lawyer assigned to represent Plaintiff in the agency Removal action that dismissed Plaintiff from service, and, as such, had the responsibilities and duties to represent Plaintiff fairly and legally. She is sued in her individual capacity.

19.     Defendant, JOEY JACKSON ("Jackson"), was a union-retained lawyer assigned to represent Plaintiff in the agency Removal action that dismissed Plaintiff from service, and, as such, had the responsibilities and duties to represent Plaintiff fairly and legally. He is sued in his individual capacity.

20.     Defendant, JOEY JACKSON LAW, PLLC ("Jackson law firm"), was the union-retained law firm, and, as such, had the responsibilities and duties to represent Plaintiff legally and equitably in the subject Agency Disciplinary and Removal action.

21.     Defendant, KARASYK & MOSCHELLA, LLP ("K & M law firm"), was the union-retained law firm, and, as such, had the responsibilities and duties to represent Plaintiff legally and equitably in the subject Agency Disciplinary and Removal action.

22.     Defendant, BENNY BOSCIO ("Boscio"), was the president of the Correction Officers' Benevolent Association, Inc. (COBA), and as such, had a fiduciary duty to enforce the provisions of the Collective Bargaining Agreement on sick leave use and terms and conditions of employment on behalf of Mr. Nelson.

23.     Defendant, CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC. ("COBA"), was, and is, the Municipal Labor Organization certified to represent Plaintiff in collective bargaining and conditions of employment matters, including disciplinary and removal actions that are subject to the provisions of Civil Service Law section 75,

and, as such, had fiduciary responsibilities and duties to represent Plaintiff's employment interest fairly and legally in the subject Agency disciplinary and removal action.

## FACTUAL ALLEGATIONS

24.     On June 27, 2016, Mr. Nelson was appointed to the Civil Service position of NYC Correction Officer in the City's Department of Correction ("DOC"), subject to a two-year original probationary term pursuant to Civl Service Law § 63.

25.     After his appointment, Mr. Nelson was assigned to the DOC Correction Academy.

26.     Prior to finalizing his academy training courses, there came a day known in the DOC academy as "Shield Day."

27.     On Shield Day, trainees are presented with their official shield/badge to accompany their official employee identification card.

28.     Mr. Nelson was proud to continue his family's legacy of uniformed professionals, and on Shield Day, Mr. Nelson's mother, who is a retired DOC Correction Officer presented her son with her official shield (#13152) that she proudly wore for 25 years of service in the DOC.

29.     Mr. Nelson was very emotional and extremely honored on Shield Day to receive his official DOC shield from the hands of his mother. And he intended on wearing it proudly for at least the next 20 years of service in DOC.

30.     Upon completion of his assignment in the DOC Training Academy, Mr. Nelson was assigned to DOC's Manhattan Detention Complex ("MDC"), located in Manhattan on White Street.

31.     Mr. Nelson performed his duties well and grew in the knowledge of his chosen

career-field and profession.

32.     Mr. Nelson's steady tour of duty or work schedule was the midnight shift

(2300 x 0731hrs.) on a 4 and 2 rotation.

33.     On or about July 17, 2017, Mr. Nelson was assigned to an Extraction Team (i.e., a

team of 4 or more officers with a video camera) directed by a DOC supervisor, and

ordered to extract an unruly and noncompliant inmate from the MDC Clinic area.

34.     During that extraction of the unruly inmate, Mr. Nelson injured his left knee in the

ensuing use-of-force (UOF) that occurred to control the unruly inmate, and while moving

said non-compliant inmate from the clinic to a DOC transportation vehicle.

35.     Mr. Nelson was later diagnosed by his Treating Physician and informed that he

required surgery to repair the damage sustained to his left knee.

36.     From the date of the UOF (¶¶ 33-34), Mr. Nelson was out of work and on workers'

compensation and sick leave for approximately four (4) months.

37.     After surgery and recovery, Mr. Nelson returned to duty in or about November 2017

and continued, diligently, to perform all of his job assignments and duties as a

correction officer.

38.     On or about June 27, 2018, Mr. Nelson successfully completed his original

probationary term and was retained by DOC as a permanent Civil Service employee.

39.     In 2020, DOC closed MDC and Mr. Nelson was transferred to Rikers Island, to

DOC's Eric M. Taylor Center (or, "EMTC").

40.     Prior to September 2021, DOC closed EMTC, and Mr. Nelson was transferred to DOC's Anna M. Kross Center (or "AMKC"), which is also located on Rikers Island.

41.     On September 17, 2021, while at work and on his assigned overtime post, Mr. Nelson was instructed to report to the AMKC Administration office.

42.     After being relieved from post, and as he was making his way to the AMKC Administration office,[1] Mr. Nelson received information that he would be suspended without pay for thirty (30) days, and for supposedly being absent without leave (AWOL) on multiple dates, spanning several months.

43.     Upon his arrival to the Administration office, Mr. Nelson was ordered to surrender his shield and identification card, and told for the first time, officially, that he was being suspended for 30 days without pay for AWOLs.

44.     Mr. Nelson was given a receipt for his shield and identification card.

45.     Mr. Nelson was also given a copy of the Formal Charges and Specifications (2 pages) with the alleged AWOL dates cited thereon.

46.     The Formal Charges and Specifications are dated September 16, 2021, and are identified on that document as DOC Disciplinary Record ("DR") No. 1614/2021, and was preferred to Defendant Molina for adjudication.

47.     The *Formal Charges and Specifications* allege that on "May 12, 18, 23, 24, 2021, June 12, 16, 23, 24, 2021, July 16, 17, and 24, 2021; and dates continuing to the present" [emphasis added], Mr. Nelson was AWOL.

---

[1] AMKC is the largest jail on Rikers Island, spread out over 40 acres of land.

48.    Upon information and belief, the May 12, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

49.    Upon information and belief, the May 18, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

50.    Upon information and belief, the May 23, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

51.    Upon information and belief, the May 24, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

52.    Upon information and belief, the June 12, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

53.    Upon information and belief, the June 16, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

54.    Upon information and belief, the June 23, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

55.    Upon information and belief, the June 24, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

56.    Upon information and belief, the July 16, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

57.    Upon information and belief, the July 17, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

58.    Upon information and belief, the July 24, 2021 charge of AWOL exceeded the time for charging Mr. Nelson, and is void.

59.    Mr. Tatum informed Mr. Nelson that because each of the charged dates allegedly occurred in excess of 30 days prior to the September 16, 2021 date of the original formal charges and specifications, then according to DOC's "Command Discipline" directive (dated 12/22/05), no disciplinary action could be taken against Mr. Nelson for the alleged offenses.[2]

60.    Mr. Tatum explained that when he was a COBA delegate (2003-2005), it was the first critical point that he would look for in the course of representing correction officers in informal and formal disciplinary proceedings.

61.    Mr. Tatum also explained that he was taught this critical point by both COBA and COBA's then-law firm attorneys at union delegate seminars and in daily practice.

62.    Mr. Nelson avers that on these facts, the Formal Charges and Specifications made under DOC DR No. 1614/2021 are, in fact, false charges, made fraudulently against him and were used to constructively dismiss him from service wrongfully.

63.    Mr. Nelson avers that he has not committed any wrongdoing as alleged, justifying the summary suspension without pay action that was abruptly and arbitrarily imposed on him September 17, 2021, and he categorically denies the formal charges and specifications alleged in DOC DR #1614/2021.

---

[2] See, DOCs Command Discipline Directive No. 4257R-A (12/22/05), at p. 9, § VI: ("Form #454, 'Charges, Specifications and Disposition,' shall be used in all cases where a supervisor is preparing a Supervisor's Complaint Report concerning a member of his/her command, regarding violation(s) of Departmental Rules/Regulations. THE USE OF ANY OTHER FORM FOR THIS PURPOSE IS PROHIBITED. The supervisor shall complete Section #1, "Supervisor's Complaint Report," and submit Form #454 to the Hearing Officer for disposition according to the following procedure)." (Emphasis in original).

And at p. 10, § VI(A)(1): ("Upon receiving Form #454 concerning a member of his or her command, which must be filed within thirty (30) days of the incident involved, the Hearing Officer shall [...])." (Emphasis added).

64.    In addition to the *Receipt* (¶ 44) and the *Formal Charges and Specifications* (¶¶ 46-47), Mr. Nelson was given a <u>Notice of Summary Suspension from Duty Form</u> ("NSS").

65.    At Section "B" on the NSS, titled "Reason for Suspension," it reads, in handwritten text, "C.O. Nelson #13152 is summarily suspended from duty. Pursuant to AWOLS, as per the assistant chief of administration." [The assistant chief is Defendant Rembert ¶ 13]

66.    The NSS also cite the violation date against Mr. Nelson as being September 14, 2021, in the section at the top of that form, titled "Date of Alleged Violation(s)".

67.    That September 14, 2021 date is in conflict with the dates cited in the charges (¶ 47); and more specifically, with at least the last date, July 24, 2021 that Mr. Nelson was alleged to have been AWOL.

68.    To be clear, September 14, 2021 is 54 days from July 24, 2021.

69.    Mr. Nelson further avers that he was not AWOL between July 24, 2021 and September 14, 2021; as was alleged in the charges; where in the specifications section after citing specific dates it reads, "and dates continuing to the present" (*see* ¶ 47 above).

70.    Mr. Nelson avers that he was not AWOL on September 14, 2021.

71.    Upon completion of the 30 day suspension from duty without pay, Mr. Nelson was returned to duty effective October 17, 2021 at 0001hrs., by direction of the NSS (¶ 64).

72.    On October 28, 2021, Mr. Nelson was assaulted by an unruly inmate.

73.    The unruly inmate physically pushed past Mr. Nelson knocking him off balance, and attempted to breach a security door, to fight with another inmate.

74.  Mr. Nelson's left knee was re-injured and he sustained an injury to his right shoulder from that violent push, as he was physically restraining the unruly inmate to prevent that inmate from breaching a security door to assault another inmate.

75.  Mr. Nelson's treating physician's diagnoses determined that surgery was needed to repair the new damage to his left knee, and surgery was scheduled for December 8, 2021.

76.  Pre-Op evaluation was scheduled for December 3, 2021, at the New York Presbyterian /Lower Manhattan Hospital.

77.  Mr. Nelson continued working until December 6, 2021, and then called out sick for December 7, 2021 to prepare for surgery the next day.

78.  Mr. Nelson's collective bargaining agreement provisions on sick leave provided him with unlimited sick leave.

79.  COBA's Collective Bargaining Agreement, Article X, Section 1 reads,

> ARTICLE X - LEAVES
>
> Section 1.  Sick Leave
>
> (i)
> Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect which is service-connected pursuant to Section 9-117.1(a) of the Administrative Code.
>
> (ii)
> Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect, whether or not service-connected.

80.  In late November 2021, Mr. Nelson was contacted by Defendant Troxler on the phone.

81.    Troxler introduced himself and told Mr. Nelson that he was the COBA lawyer who would be representing him in the 30-day suspension without pay disciplinary case.

82.    Defendant Troxler did not say to Mr. Nelson would you like for me to represent you.

83.    Defendant Troxler did not say to Mr. Nelson would you like to retain me for legal services.

84.    Troxler further stated to Mr. Nelson that he was reviewing his case for the reason Mr. Nelson was suspended for 30 days without pay.

85.    Troxler told Mr. Nelson on this phone call that there was a Pre-Trial Conference date scheduled in December 2021, at the City's Office of Administrative Trials and Hearings ("OATH") for the administrative disciplinary charges (¶ 46) made against Mr. Nelson.

86.    Unaware of how the disciplinary process worked, Plaintiff was confused and thought that he had already been penalized by the 30 day suspension, and that that was the end of the matter.

87.    At no time on that phone call did Defendant Troxler mention the 30-day time limit of DOC Directive #4257R-A that Mr. Tatum told Mr. Nelson about.

88.    Nonetheless, Mr. Nelson told Troxler that he could not make that appointment due to his scheduled surgery set for December 8, 2021.

89.    Troxler's response was cold and unempathetic.

90.    Troxler responded saying that is fine, you will have the pre-trial conference over a Zoom call in the middle of December.

91.  This too was confusing to Mr. Nelson because he knew that he would be on sick leave status and did not know why he would be scheduled for a pre-trial conference during that time period.

92.  But Mr. Nelson did not know how to challenge Defendant Troxler or the things Troxler was saying to him so, he just acknowledged Troxler's instructions and eventually completed the call.

93.  On December 6, 2021, Mr. Nelson forwarded the *Patient Instruction Sheet* that he had received from the hospital to Defendant Troxler at Troxler's email address: peter.troxler@joeyjacksonlaw.com.

94.  Also in December 2021, Mr. Nelson emailed Troxler documents to support his claims that on the days which DOC claimed he was AWOL, he in fact had personal emergencies of a medical nature due to his elderly grandmother's debilitating ailments.

95.  Thereafter, and on December 27 or 28, 2021 the Webex call was held (at: https://nyc-oath.webex.com/nyc-oath/j.php?MTID=m9076785855e74ba15b2a6ae8619773a4), and Troxler had Mr. Nelson's Section 75 disciplinary proceeding adjourned to May 2022.

96.  Upon information and belief, Defendant Molina and the DOC have no written formal disciplinary procedures that are adhered to by them, for the carrying out of removal and other disciplinary actions in accord with the procedural requirements of Civil Service Law Section 75.[3]

---

[3] The source of Mr. Nelson information and belief is consultation provided and publicly available documentation shown and provided to him from Mr. Wayne Tatum. (Mr. Tatum will be discussed in more detail below).

97.     Because Defendant Molina did not have any written formal disciplinary procedures in
place to carry into effect the provisions of Civil Service Law § 75, in removal and other
disciplinary actions, Mr. Nelson was prejudiced by the wrongful disciplinary action that
was taken against him in DR #1614/2021 (as amended in April 2022).

98.     In or about mid April 2022, after calling out sick beginning December 7, 2021,
Mr. Nelson returned to duty from the December 8, 2021 surgery and recovery period.

99.     On April 14, 2022, while Mr. Nelson was at a scheduled appointment at DOC's
Health Management Division (also called, "HMD"), Mr. Nelson was served with
"Amended" Formal Charges and Specifications.

100.    The Amended formal charges and specifications bear the same DOC DR No. of the
*original Formal Charges and Specifications* dated September 16, 2021: DR #1614/2021
(*Ref.* ¶¶ 46-47).

101.    However, the <u>amended charges</u> now included one new specification, alleging that
Mr. Nelson demonstrated "an excessive use of sick leave."

102.    The new charge specifically alleged,

> Said officer, from on or about November 1, 2021 through
> April 12, 2022, and continuing to present, failed to
> efficiently perform his duties in that he has demonstrated a
> pattern of excessive absence and being unable to perform
> the full range of duties of his position as a correction
> officer by reporting sick on approximately eighty-nine (89)
> days, demonstrating an excessive use of sick leave and/or
> an inability/medical incompetence to perform his duties as
> a correction officer. Said officer also failed to provide
> adequate medical documentation for all absences as
> required.

103.    Mr. Nelson avers that he has not committed any wrongdoing as alleged in the Amended Formal Charges and Specifications above, and he categorically denies the Formal Charges and Specifications alleged in DOC's AMENDED DR #1614/2021.

104.    The charge of "excessive" use of sick leave flies in the face of the sick leave provisions in the COBA collective bargaining agreement (¶ 64).

105.    Mr. Nelson did forward to Def. Troxler, via email, his documentation to counter the AWOL charges and so-called excessive sick leave charges.

106.    Mr. Nelson also told Troxler verbally that 2 of the dates that he was alleged to have been AWOL were actually vacation days granted to Mr. Nelson by Personnel.

107.    Mr. Nelson lived with his 98 year old grandmother who raised him from birth while his mother worked full time in DOC. No other family members lived with him and his grandmother in the home, as he is an only child.

108.    Mr. Nelson's grandmother's health began deteriorating over the years and because he had no other assistance, he alone was responsible for taking care of his grandmother.

109.    Some of the dates that DOC alleged that Mr. Nelson was AWOL and *late to duty* were in fact dates that Mr. Nelson was tending to his grandmother; as he had no help and could not afford a Home Health Aide at the time.

110.    But, prior to his unlawful removal from service, Mr. Nelson had not been given a disciplinary hearing in accord with Civil Service Law § 75 to determine the charges surrounding the dates he was allegedly AWOL.

111.    Moreover, a single instance of AWOL (and up to 5 instances of AWOL) was subject to DOC's Command Discipline policy; as set forth in DOC Directive #4257R-A, and shown above through consultation with Mr. Tatum.

112.    Such instances of AWOL are defined as "minor violations" in Directive #4257R-A, and would not have required formal disciplinary action if, in fact, DOC addressed each alleged AWOL and charged Mr. Nelson on or in close proximity to the first date alleged in the charges.

113.    Nonetheless, Mr. Nelson denies ever being AWOL as alleged.

114.    In a phone call from Defendant Troxler on May 31, 2022, Troxler told Mr. Nelson that the Assistant Commissioner did not care about the personal emergency documents that Mr. Nelson had submitted, and that DOC was still counting the dates as AWOLs.

115.    Troxler told Mr. Nelson that there was no need for them to go before the judge in person at OATH because he had made an arrangement with the judge and that Mr. Nelson is on a two year limited probation (through a Negotiated Plea Agreement ("NPA")) due to the personal emergencies that were turned into AWOLs by DOC.

116.    Upon information and belief, OATH and its administrative law judges did not have lawful authority to be involved in the prosecution of formal disciplinary proceedings against Mr. Nelson, DOC DR No. 1614/2021, which were initiated by Solange N. Grey, the Deputy Commissioner of DOCs Trials & Litigation.

117.    Through consultation from Mr. Tatum, Mr. Nelson later discovered that OATH and its administrative law judges are not supposed to have any dealings or involvement with the

prosecution of formal disciplinary proceedings taken against Mr. Nelson and initiated by

Solange N. Grey, the Deputy Commissioner of DOCs Trials & Litigation.

118.    In support of his consultation on this point, Mr. Tatum showed Mr. Nelson the

provisions of Mayoral Executive Order (MEO) No. 105 (December 26, 1986),

Amendment of Executive Order No. 16 (July 26, 1978) and No. 78 (October 5, 1984).

119.    At Section of that provision in MEO #105 it reads, in relevant part,

> Section 3. Section 5(a) of prior Executive Order No. 16,
> dated July 26, 1978, as amended by Executive Order No.
> 78, dated October 5, 1984, is hereby amended to read as
> follows:
>
> Section 5. Formal Disciplinary Proceedings.
>
>    (a)    Effective July 1, 1987, each agency shall be
> responsible for the preparation and prosecution of all
> formal administrative proceedings, including removal and
> other disciplinary proceedings for misconduct or
> incompetency. Each agency head shall establish a system
> for such formal disciplinary proceedings in consultation
> with the Commissioner. [...] The Inspector General shall be
> notified before the initiation of formal disciplinary
> proceedings against an employee and shall be notified of
> the disposition of all formal disciplinary proceedings.

120.    Mr. Tatum advised Mr. Nelson that based on these provisions of MEO #16

(as amended by MEO #105), and because OATH and its administrative law judges were

not subordinates of Defendant Molina or, officials of DOC, the OATH "judge" that

Defendant Troxler negotiated with on DOC DR No. 1614/2021 was not authorized to

negotiate those disciplinary charges that were, in fact, preferred to Defendant Molina for

adjudication.

121.    Troxler emailed the NPA to Mr. Nelson and told Mr. Nelson that for the personal emergencies turned into AWOLs, DOC gave him one (1) year probation plus the loss of 15 comp days. See DOC Negotiated Plea Agreement #1; annexed hereto as **Exhibit "1"**.

122.    And one (1) year probation plus the loss of 15 comp days for violating the sick leave policy. Totaling two years limited probation and the loss of 30 days comp time.

123.    At no time during the May 31, 2022 phone call did Troxler invoke or say that he invoked the provisions on sick leave in the COBA collective bargaining agreement on Mr. Nelson's behalf.

124.    At no time prior to May 31, 2022 did Mr. Nelson participate in any negotiations with DOC regarding the charges made against him in DOC DR #1614/2021 (¶¶ 46-47).

125.    DOC did not offer or schedule Mr. Nelson for an official conference at any of its facilities, units, or at DOC's headquarters and business address to discuss or negotiate the Formal Charges and Specifications within DOC DR #1614/2021.

126.    Troxler, COBA, DOC, and OATH alone arranged and settled the NPA, outside of Mr. Nelson's presence or knowledge and, without Mr. Nelson's consent.

127.    Upon information and belief, this is a standard practice of Troxler, COBA, DOC, and OATH against correction officers in DOC.

128.    Troxler's phone call to Mr. Nelson (¶ 113) was Nelson's first time hearing of the NPA involving the false formal disciplinary charges in DR #1614/2021.

129.    Troxler alone was the person that provided the NPA to Mr. Nelson; which is a fixed DOC Form (or fillable template).

130.    No DOC official or any other governmental official was present on the May 31, 2022 phone call from Troxler.

131.    During this call on May 31, 2022, Mr. Nelson's mother ("Celia Nelson-Dean"), who often participated on the phone calls between Mr. Nelson and the COBA-retained lawyers (Defs. Troxler and Maldonado), asked Troxler a series of questions about the NPA and Mr. Nelson's case.

132.    Troxler answered Mrs. Nelson-Dean's questions, and stated to both her and Mr. Nelson that DOC is doing a lot of illegal things and getting away with it; he engaged her on topics that she raised; that is, Mrs. Nelson-Dean asked about the duration of the probation period and what was Nelson permitted to do or not do while on it for two years.

133.    Troxler explained that if Mr. Nelson were to take any vacation during the NPA, then that time used would be put on the back end of the two-year probation period and that Nelson would have to pay that time back by an extension of the probationary period.

134.    Troxler said the same goes for any sick days Mr. Nelson takes.

135.    Troxler stated, "I'm not telling you not to take a vacation because everyone needs a break. It would just be made up on the back end."

136.    Troxler discussed a number of scenarios that would cause the limited probationary period to be extended.

137.    In effect, Defendant Troxler's actions on May 31, 2022 during that phone call were more like an employee of DOC and a subordinate or, representative of Defendant Molina than a union-retained attorney for union members.

138.    Both Mr. Nelson and his mother were confused with the amount of things Troxler

said would cause the (unofficial) limited probationary period to be extended.

139.    Mr. Nelson then told Troxler that he also needed to have surgery on his right shoulder

due to an injury sustained in the October 28, 2021 UOF incident (¶ 72).

140.    Troxler told Mr. Nelson that no additional surgeries could be done until after the

completion of the NPA contract. Which as stated above, was for two years.

141.    Troxler then told Mr. Nelson to sign the NPA agreement to keep his job or he would

get terminated right then and there, and that even if Mr. Nelson were to go to trial he

would lose his case.

142.    Mrs. Nelson-Dean was still present at this point on the phone call, which was

conducted the whole time over Mr. Nelson's speakerphone.

143.    Defendant Troxler's threats of immediate termination and that Nelson would lose at

trial greatly troubled Mr. Nelson.

144.    Mr. Nelson feared that during a two-year probation period that anything could happen

to jeopardize that period of time, since, *inter alia*, he alone had to care for his

grandmother; for example, he feared being late to work or needing to take time off to tend

to his grandmother or, that he himself may become ill and need to use his sick leave time.

145.    Many thoughts raced through Mr. Nelson's mind of the many things in life that could

happen or go wrong during the two year period that would jeopardize his ability to

complete that probationary period successfully.

146.    The pressure in the moment was great and enormous to Mr. Nelson.

147.    After already successfully completing his original two-year probationary period, which was required to attain tenure in his Civil Service position six years earlier, the thought of a new two-year probationary period was extremely stressful and overwhelming for him.

148.    With no other options offered to him by Troxler, Mr. Nelson then signed the NPA electronically to remain employed, but under great duress and complete confusion, and emailed the now signed NPA (¶ 120; Ex. 1) back to Defendant Troxler.

149.    After confirming receipt of the signed NPA, Defendant Troxler ended the phone call.

150.    The next month, June 2022, Mr. Nelson had already returned to full duty.

151.    However, it was difficult to work at times due to the silent but ever present notion and stress of possibly being terminated from work under the NPA.

152.    Then on November 22, 2022, Mr. Nelson was abruptly suspended from duty without pay and without prior notice of any charges or, of an impending suspension.

153.    The Notice of Summary Suspension from Duty without pay form was given to him on the day of the suspension (11/22/22). Which was for ten (10) days, to December 2, 2022.

154.    DOC did not give Mr. Nelson an opportunity to answer any disciplinary charge(s) that were the reason for the summary suspension from duty action taken against him.

155.    And no Union representative was present; nor did DOC allow Mr. Nelson to contact COBA for representation in the matter.

156.    DOC Captain Powell just demanded Mr. Nelson give in his shield and identification card.

157.    Mr. Nelson complied and was given a departmental receipt for that property.

158.    DOC did not serve Mr. Nelson with any set of disciplinary charges; but in the *description* section of the *notice of summary suspension from duty* form, it appeared that DOC viewed one of its Genetec video surveillance cameras from November 20, 2022 and alleged, based on that footage, that Mr. Nelson was off post during an inmate fight.

159.    Mr. Nelson categorically denies committing any wrongdoing as alleged in the description section of the *Notice of Summary Suspension from Duty* form; which was signed by Captain Powell and dated, November 22, 2022.

160.    Upon information and belief, other correction officers and other uniformed employees in DOC are often suspended in like fashion throughout the whole department.

161.    During Mr. Nelson's tenure at DOC, he has both observed and is aware of the fact that DOC suspends correction officers from duty abruptly, without notice, and often for 30 days without pay on allegation of minor violations.

162.    There are no official suspension procedures, which are fair, that DOC follows.

163.    Beginning in January 2023, Mr. Nelson suffered migraine headaches that persisted often prior to reporting for duty and, even while on duty.

164.    Mr. Nelson avers that this medical condition is due to the unwarranted and unjust stressful working conditions placed on him by the defendants in the wrongful disciplinary action that was taken against him under DR No. 1614/2021.

165.    Between December 2022 and February 2023, Mr. Nelson notice that his weight was fluctuating and that his appetite was irregular. This he associated with the stress and always present threat of loosing his employment due to the unofficial NPA; (¶¶ 114-121).

166.    On February 14, 2023, Mr. Nelson was served with disciplinary charges for the November 20, 2022 incident (¶¶ 152-159) that led to the summary suspension from duty beginning November 22, 2022 to December 02, 2022.

167.    The DOC disciplinary charges (above) are identified as DOC DR #2266/2022, and allege, in part, that Mr. Nelson "was off his assigned post for several minutes."

168.    Mr. Nelson categorically denies committing any wrongdoing as alleged in the DOC disciplinary charges identified as DOC DR #2266/2022.

169.    In March 2023, Mr. Nelson was diagnosed with Irritable Bowel Syndrome ("IBS"), and prescribed medication for that medical condition by his treating physician.

170.    Mr. Nelson avers that this medical condition is due to the unwarranted and unjust stressful working conditions placed on him by defendants Troxler, COBA, and DOC official who falsely charged him with frivolous charges and specifications.

171.    Also in March 2023, Defendant Troxler once again presented Mr. Nelson with a second DOC NPA to sign, via email.

172.    It was on March 24, 2023 that Defendant Troxler emailed Mr. Nelson with a DOC Negotiated Plea Agreement form to sign, for DR #2266/2022. See DOC Unofficial Negotiated Plea Agreement #2; annexed hereto as **Exhibit "2"**.

173.    Upon information and belief, Defendants Jackson and Jackson Law uses their own attorneys, paralegals, or office staff employed by them, to create and prepare DOC negotiated plea agreements on DOCs behalf.

174.    They then work with Defendant Molina and DOC staff in the Trials & Litigation division at DOC, to obtain the signature of correction officers who have been fraudulently charged with allegations of misconduct.

175.    In this second NPA provided by Defendant Troxler, once again, Mr. Nelson was not notified by DOC of its intent to negotiate the disciplinary charges that it brought against Mr. Nelson in DR #2266/2022.

176.    DOC did not schedule any official appointment for Mr. Nelson to appear or meet with any DOC official to discuss the disciplinary charges in DR #2266/2022.

177.    Mr. Nelson avers that any such meeting with DOC officials on the subject of the disciplinary charges made in DR #2266/2022 occurred between Defendants COBA, Jackson Law, Jackson, and Troxler; without Mr. Nelson's knowledge or consent.

178.    Troxler told Mr. Nelson to just sign the NPA and it will be "time served" with no probation attached and no further charges.

179.    Mr. Nelson was afraid to go against Defendant Troxler because Troxler would not hear him before so, it made no sense to decline Troxler's instructions to sign the NPA.

180.    Mr. Nelson feared that if he did not sign as directed by Troxler, then somehow Troxler would have caused an increase penalty to be imposed on Mr. Nelson through Troxler's connections and association with DOC officials.

181.    Like the first NPA (¶ 121), Mr. Nelson signed this NPA (¶ 172) under duress, confusion, and fear.

182.    During April of 2023, Mr. Nelson's grandmother became very ill. She wasn't able to walk, was very short of breath, and her entire body was swollen.

183.    Mr. Nelson and his mother had to call 911 for an ambulance to immediately transport his grandmother to Methodist Hospital.

184.    Mr. Nelson's grandmother stayed in the hospital for two weeks before being discharged.

185.    The hospital told Mr. Nelson and his mother that his grandmother has mild heart failure and her kidney is only functioning at 14%.

186.    The hospital told Mr. Nelson and his mother to make his grandmother comfortable at home because there is nothing else they can do for her.

187.    She was placed on at-home hospice by Calvary Hospital on or about May 4, 2023.

188.    When they brought her home, Mr. Nelson and his mother had no home health aide for the first month, and Mr. Nelson and his mother were struggling to take care of her.

189.    Mrs. Nelson-Dean actually lived in Delaware, but came to New York City for her own medical and surgical appointments, related to her then recent surgery for simultaneous bilateral knee replacement.

190.    Due to her own medical condition, Mrs. Nelson-Dean was not able to care for or attend to Mr. Nelson's grandmother herself; prompting Mr. Nelson to take days off work.

191.    Eventually, under Mr. Nelson's grandmother's health insurance, they were able to get a home health aide, but that person only worked in the mornings.

192.    Specifically, Monday - Friday 0900 to 1300hrs.

193.    There was no home health aide that worked on the weekends or in the afternoons.

194.    After his work shift, Mr. Nelson had to take care of his grandmother with his mother or, alone because his mother was unable, and no home health aide was available.

195.    These family medical issues and challenges were the main contributors to

Mr. Nelson's need to take off work through Personal Emergencies ("PE")'s or, which

actually caused him to be tardy at times, but never excessively.

196.    Although he may have been tardy at times, Mr. Nelson was never administratively

charged with excessive lateness.

197.    DOC 's personnel records of Mr. Nelson may show latenesses but, DOC has never

administratively charged him with being late excessively to the point where it became a

chargeable offense.

198.    Mr. Nelson was eventually able to hire a second Home Health Aide with his own

finances, and now things are more so under control until his grandmother passes on.

199.    In May 2023, Mr. Nelson applied for an FMLA Intermittent Leave of Absence with

DOC, so that he could care for his grandmother who raised him from birth.

200.    In his FMLA application to DOC, Mr. Nelson specifically stated that his grandmother

raised him from birth.

201.    Despite this key fact, in its reply letter dated May 26, 2023, DOC denied Mr. Nelson's

FMLA request.

202.    In June 2023, Mr. Nelson sought help from DOC's EEO Unit, and requested a

reasonable accommodation to take care of his grandmother.

203.    In an email letter dated July 5, 2023, DOC's Disability Rights Coordinator

Nancy Bleakley, Esq. wrote, in part, "Unfortunately, reasonable accommodations through

EEO do not cover request for care of another."

204.    Mr. Nelson did not and was not inclined to contact Defendant COBA in regards to his request for leave or reasonable accommodations because he believed it to be something he could only obtain through DOC.

205.    In addition, during his tenure at DOC, Mr. Nelson has not seen COBA provide any assistance to its members in like situations that he was experiencing concerning his grandmother; that is, in situations requiring a reasonable accommodation.

206.    Nor did COBA have any published information that Mr. Nelson was aware of, informing its members to contact COBA for reasonable accommodation matters.

207.    COBA was simply no help to Mr. Nelson, and very untrustworthy.

208.    During Mr. Nelson's tenure, COBA has not helped correction officers that were having any type of labor relations issues with DOC; for example, when officers are ordered to report to OATH for a disciplinary hearing, Defendant COBA or its law firms has never defended those correction officers' rights under Civil Service law in any DOC ordered disciplinary hearings.

209.    And more often, if not all the time, the officer that goes to OATH for a disciplinary hearing lose their case ninety-nine or even one-hundred percent of the time.

210.    In or about July 2023, DOC closed or were in the process of closing AMKC, and Mr. Nelson was transferred to EMTC; where he worked for approximately one week.

211.    Then, on July 31, 2023, Mr. Nelson was abruptly and without notice dismissed from service by Defendant Thomson, through a typed letter that was given to him at EMTC. See Termination Letter; annexed hereto as **Exhibit "3"**.

212.    Mr. Nelson had worked the midnight shift from the night of the 30th into the morning of July 31st: 2300-0731hrs. And continued to work the day shift of July 31, 2023 on overtime, until approximately 1200hrs. Upon signing in, he noticed a Personnel Stamp next to his name on the *sign-in/out sheet* instructing him to report to the Personnel Office.

213.    At the end of his overtime shift and upon being relieved from post, Mr. Nelson reported to the Personnel Office.

214.    When he arrived at Personnel, no one knew why his name was stamped; and staff there called into the Warden's office to find out.

215.    After that call, the personnel staff told Mr. Nelson to go to the Warden's office.

216.    He did so promptly.

217.    Once he arrived at the Warden's office, the Commanding Officer of EMTC, and newly appointed Assistant Commissioner Sonya Harvey ("AC Harvey"), showed Mr. Nelson the letter of termination (¶ 211) and asked if he knew about it.

218.    Confused and perplexed, Mr. Nelson replied that he did not know anything about the termination letter.

219.    After a brief discussion, and based on the termination letter from Def. Thomson, AC Harvey directed Mr. Nelson to surrender his shield and identification card to her.

220.    At no time did AC Harvey ask Mr. Nelson if he wanted a representative from COBA to be present in the dismissal action being taken against him.

221.    AC Harvey then provided a letter addressed to Rikers Island Security, directing that Mr. Nelson be allowed egress from Rikers Island due to the fact that he no longer had a

departmental identification card or shield, and had been dismissed from service. See Rikers Island Exit Letter; annexed hereto as **Exhibit "4"**.

222.   At no time did Defendant Molina contact Mr. Nelson on or before July 31, 2023 regarding the dismissal from service action that was taken against Mr. Nelson by Defendant Thomson.

223.   At no time did Defendant Molina speak with Mr. Nelson on or before July 31, 2023 regarding the dismissal from service action that was taken against Mr. Nelson by Defendant Thomson.

224.   At no time did Defendant Molina notify Mr. Nelson on or before July 31, 2023 that he had delegated his authority to Defendant Thomson regarding the dismissal from service action that was taken against Mr. Nelson by Defendant Thomson.

225.   At no time did Defendant Thomson contact Mr. Nelson on or before July 31, 2023 and say that she had been delegated by Defendant Molina to dismiss Mr. Nelson from service by a letter.

226.   After exiting Rikers Island (¶ 221), Mr. Nelson immediately telephoned Defendant Boscio, and told him all that happened to him.

227.   The reason Mr. Nelson was able to call the personal phone number of Mr. Boscio is because earlier in that year (2023), when Mr. Nelson had an issue at work, Mrs. Nelson-Dean called Defendant Boscio direct, and spoke to him for an extended period of time.

228.   During that earlier issue at work, Mr. Boscio called Mr. Nelson's home phone and spoke with both Mr. Nelson and Mrs. Nelson-Dean. On that call, Mr. Boscio provided his personal phone number to Mr. Nelson.

229.    So then on the July 31, 2023 phone call to Mr. Boscio directly after the dismissal from service (¶¶ 211-221), which lasted approximately 5-10 minutes, Mr. Boscio told Mr. Nelson that he would have Attorney Joey Jackson contact him.

230.    After his call with Mr. Boscio, and when Mr. Nelson reached home, he was contacted on his cell phone by Defendant Jackson.

231.    As Mr. Nelson was explaining the details of what happened and how he was dismissed from service, Attorney Jackson advised Mr. Nelson not to speak too much over the phone, and that someone would be in contact with him.

232.    Mr. Nelson was next contacted by Defendant Maldonado.

233.    And on August 3, 2023, Defendant Maldonado, through Defendant K & M law firm, had Mr. Nelson sign a pre-filled Freedom of Information Law ("FOIL") request form before a notary so that his "Law Enforcement Disciplinary Records" could be obtained from DOC by Defendant K & M law firm.

234.    Mr. Nelson signed the FOIL form and had it notarized on August 3, 2023, and sent it back to Defendants Maldonado and K & M law firm.

235.    On that same date, upon information and belief, Defendant K & M law firm, in an email dated August 3, 2023, made the FOIL request to DOC's *Records Access Officer*.

236.    Also on August 3, 2023, Mr. Nelson telephoned Wayne Tatum.

237.    Mr. Nelson's co-worker had given him Mr. Tatum's phone number and explained that earlier in that co-worker's career, he had an issue with his Command's Personnel Office and used Mr. Tatum's consultation and representation services.

238.    He explained that through Mr. Tatum's assistance, his employment controversy was

resolved with no adverse personnel action taken against him.

239.    Wayne Tatum is a former correction officer and COBA delegate.

240.    He now has his own business and is a Labor Relations and Civil Service Consultant

(*see*, http://www.waynetatumandthemovement.com/).

241.    During the call with Mr. Tatum, Mr. Nelson explained the details of how he was

dismissed from service.

242.    Mr. Tatum asked if Mr. Nelson could email a copy of his dismissal papers to him.

243.    Mr. Nelson then emailed his termination letter (¶ 211) to Mr. Tatum, and some other

documents pertaining to his dismissal case.

244.    After a brief discussion, Mr. Tatum agreed to speak again in the following week.

245.    On or about Tuesday, August 8, 2023, Mr. Tatum held a full telephone interview with

Mr. Nelson.

246.    In that call, Mr. Nelson told Mr. Tatum that Defendant Maldonado was working on

his case and that she was waiting for DOC to respond to Nelson's FOIL request for his

disciplinary records to be sent to Defendant K & M law firm.

247.    Mr. Tatum asked Mr. Nelson if Def. Maldonado said anything about the fact that

Defendant Thomson could not terminate his employment because she was not the

commissioner of correction.

248.    Mr. Nelson responded in the negative, saying that Defendant Maldonado did not

mention that to him.

249.    Mr. Tatum said that when he saw the termination letter (¶ 211), he immediately noticed that fact and said to Mr. Nelson that, "Your union-attorney should have told you that without hesitation."

250.    Mr. Tatum explained that pursuant to the provisions in § 815 of the City Charter, Commissioner Molina had the power to appoint and remove, and not Defendant Thomson.

251.    Mr. Tatum then told Mr. Nelson to hold on to the termination letter "because that is your proof that you weren't removed by the commissioner."

252.    At the time, Mr. Nelson was not clear about the information Mr. Tatum was saying to him but later discovered, after reading NYC Charter § 815(f), that what Mr. Tatum was saying about the power to appoint and remove was in fact true.

253.    After a few more words and discussion, Mr. Tatum told Mr. Nelson to keep him posted on his progress with his case, and then they both ended the call.

254.    On August 22, 2023, Mr. Nelson received an email from Defendant Maldonado stating that they "just received [his] termination records from DOC," and that she was "forwarding them to [him] right away, even before [her] own review."

255.    Maldonado further stated in that email (which included the records as an attachment) that she would "look at them carefully" and "reach out later in the month to discuss."

256.    On or about August 30, 2023, Mr. Nelson forwarded the FOIL/termination records to Mr. Tatum via email.

257.    And in a follow-up phone call on September 1, 2023, Mr. Tatum said that he reviewed all of the FOIL documents and explained to Mr. Nelson the several improper steps taken

in the DOC's disciplinary and/or removal action against Mr. Nelson that, Mr. Tatum said, the union-attorneys should have told Mr. Nelson.

258.    First, Mr. Tatum said that if Mr. Nelson was in fact a probationary correction officer, or "subject[ed] [himself] to termination as any other probationary employee" (*see* ¶ 121 Ex. "1": NPA and *attached* <u>Probation Agreement Form</u> at *para* 4).

259.    Then according to the Rules of the City of New York (55 RCNY Appendix A) 5.2.7, only the commissioner of correction could remove a probationary employee for unsatisfactory performance or for misconduct, and not Defendant Thomson.

260.    Mr. Tatum continued and said that because DOC claimed that you violated rules, then they were supposed to hold a hearing to determine those charges or allegations of rule violations. Not just say that Mr. Nelson was in violation of rules and <u>not</u> hold a hearing to determine those claims of rule violations that were made against him.

261.    Mr. Tatum exclaimed that Mr. Nelson's "union-lawyers should have told you this."

262.    After the September 1, 2023 phone call with Mr. Tatum, Mr. Nelson along with Mrs. Nelson-Dean had a phone call with Defendant Maldonado, wherein Mr. Nelson mentioned (on advice from Mr. Tatum) that Defendant Molina had not signed off on his termination. To which Maldonado replied saying that "Anybody can terminate you on probation. Not just the commissioner."

263.    The discussion continued at length about Mr. Nelson's desire to fight to get his employment back with DOC.

264.    However, after that phone call and in an email from Defendant Maldonado, dated September 6, 2023, any hope of reinstatement that Mr. Nelson had was unfairly snuffed out by what Maldonado said in that email.

265.    In her email, Maldonado indeed acknowledged that the discussion between herself, Mr. Nelson, and his mother was in fact, a "long discussion."

266.    And Maldonado also acknowledged that it was "abundantly clear that [Mr. Nelson] [wanted] to challenge [his] termination" (emphasis added).

267.    Nonetheless, Maldonado stated, "For the reasons we discussed on the phone, I think an Article 78 is not likely to result in your reinstatement." See Maldonado's Email, dated September 6, 2023; annexed hereto as **Exhibit "5"**.

268.    Defendant Maldonado's instructions in the email then put the burden on Mr. Nelson to develop reasons or justifications for the tardy accusations made against him by DOC. Even though DOC never held a Civil Service Law Section 75 disciplinary proceeding to determine those tardy accusations that were made by DOC.

269.    Toward the end of her email, Defendant Maldonado stated that her "services were provided through COBA"; but then stated, "My office will then reach out to you about the filing fee."

270.    These statements in the email were confusing to Mr. Nelson (he reasoned that) if COBA paid for her services, then why would her office charge him for the "filing fee."

271.    Upon information and belief, Defendant COBAs retainership with K & M law firm includes monetary provisions for appealing a correction officers' Section 75, Civil Service Law, hearing determination, to the courts via an Article 78 proceeding.

272.    Since Mr. Nelson's employment and membership in COBA, Defendant COBA has never disclosed its retainership information with the COBA membership.

273.    Defendant K & M law firm is Defendant COBAs law firm; not the COBA membership's and not Mr. Nelson's.

274.    Likewise, Defendant Jackson law firm is Defendant COBAs law firm; not the COBA membership's and not Mr. Nelson's.

275.    Upon information and belief, Defendant COBAs retainership papers will reveal the extent of what COBA paid K & M law firm for disciplinary cases and any appeals from such cases.

276.    On or about September 12, 2023, Mr. Nelson was instructed by a DOC official that he should write a request to DOC to be reinstated, and was given the name (Fabian Gomez) and a phone number (718-546-3121).

277.    Mr. Nelson called the phone number and obtained the email address to send his reinstatement request to.

278.    And on or about September 20, 2023, Mr. Nelson emailed his reinstatement request (a four-page letter) to Wendy Brunson, of DOC's Restoration and Reinstatement Section: DOCrestorationreinstatement@doc.nyc.gov.

279.    Eventually, DOC scheduled Mr. Nelson for a medical for reinstatement purposes at HMD (¶ 99), set for October 10, 2023.

280.    On that date, Mr. Nelson appeared at HMD for the scheduled appointment and was cleared by HMD for both his medical and psychological evaluations for reinstatement.

281.    In fact, on the "Case Disposition" sheet from HMD that was given to Mr. Nelson, the box for "Return to Full Duty" was checked and the form was signed by an HMD' doctor.

282.    Although DOC scheduled Mr. Nelson for the medical and psychological evaluations for reinstatement, and Mr. Fabian Gomez communicated with him by text, phone, and email throughout the month of October 2023.

283.    And even though Mr. Nelson was told in a phone conversation with Mr. Gomez on October 27, 2023 that he (Mr. Gomez) was "only waiting for the signature from the chief of staff," and when that is done then he will contact Mr. Nelson.

284.    On October 31, 2023, Mr. Nelson received an email from Fabian Gomez (¶ 276) with the statement, "Please see attached decision regarding your reinstatement request."

285.    The decision was a denial from Defendant Thomson. See Reinstatement Decision; annexed hereto as **Exhibit "6"**.

286.    But the date on the decision letter was October 2, 2023.

287.    In light of Mr. Nelson's ongoing communication with Mr. Gomez, the denial letter from Defendant Thomson appeared to be deliberately backdated, in front of Mr. Nelson's October 10, 2023 HMD appointment.

288.    Mr. Nelson avers that this was simply unfair that DOC would string him along, falsely leading him to believe that he would be reinstated, and even giving him an official document directing that he "Return to Full Duty" effective October 11, 2023, but then deny his request in the manner that was done to him by Defendant Thomson.

289.    In her one-page denial letter, Defendant Thomson did not make any statements on Mr. Nelson's HMD appointment and the results of that appoint; nor did she give any reason why it took nearly 30 days for her purported denial letter to reach Mr. Nelson.

290.    Upon information and belief, because Defendant Thomson was not the Commissioner, she had no authority or power to deny Mr. Nelson's reinstatement request.

291.    Mr. Tatum informed Mr. Nelson of the fact that under Charter § 815(f), only the head of DOC, which was Molina, could deny a request for reinstatement; since he alone possessed the power to appoint and remove. _Id_.

292.    Also in the month of October 2023, and in an attempt to exhaust his available remedies, Mr. Nelson filed a grievance with Defendant COBA on October 27, 2023, asking both Defendant Boscio and the COBA Executive Board to intervene on his behalf. See Nelson's Letter and Grievance to COBA Executive Board, annexed hereto as **Exhibit "7"**.

293.    As of the date of this Complaint, Defendants Boscio and COBA has not contacted Mr. Nelson or, responded to Mr. Nelson's request that it file a grievance against DOC on his behalf.

294.    Since first contacting Mr. Tatum (¶ 236), Mr. Nelson received Tatum's professional consultation on the subject of both informal and formal disciplinary action matters as it related to Mr. Nelson's employment controversy.

295.    It was Mr. Tatum's professional consultation on DOC's policies on disciplinary action at both the Command level under DOC Directive #4257R-A, and in formal disciplinary

action taken pursuant to Civil Service Law section 75 that informed Mr. Nelson's approach in trying to regain his employment back with DOC.

296.   Through Mr. Tatum's professional consultation, Mr. Nelson learned that the original charges of AWOL (¶ 46-47) were made in violation of DOC Directive #4257R-A.

297.   And that DOC Directive #4257R-A is DOC's "Informal Disciplinary Proceedings" created pursuant to Mayor's Executive Order #16 of 1978 (As Amended).

298.   Mr. Tatum also informed Mr. Nelson that Defendant Molina, as the head of DOC was the only person empowered under the City Charter to remove Mr. Nelson from service.

299.   Mr. Tatum informed Mr. Nelson of the grievance process under COBA's collective bargaining agreement.

300.   Mr. Tatum informed Mr. Nelson of the sick leave provisions in COBA's collective bargaining agreement.

301.   Mr. Tatum informed Mr. Nelson of his right to a Civil Service Law § 75 hearing to determine any properly made formal charges of incompetency or misconduct alleged against him.

302.   Unlike the clear information that Mr. Tatum gave to Mr. Nelson regarding Nelson's right to Section 75, Civil Service Law, protections.

303.   Defendant Molina's "Notice of Pleading and Hearing" section of the "Charges and Specifications" form hid this fact from Mr. Nelson.

304.   And Defendants Boscio, COBA, Troxler, Maldonado, Jackson, K & M law firm, and Jackson law firm were all aware that Molina hid the fact that Mr. Nelson had certain rights under Section 75, Civil Service Law.

305.    The full text of the relevant section of the form (¶ 303) reads,

> TAKE NOTICE that charges have been preferred against you to the Commissioner of Correction, City of New York, and that these charges, with specifications thereof, are as herein set forth. You are entitled to have legal counsel at all stages of this proceeding. Any attorney who represents you must file a notice of appearance with the Office of Administrative Trials and Hearings located at 100 Church Street, 12th Floor, New York, N.Y. 10007.

> You have the right to file an answer to these charges within eight days of service to the undersigned, who has been designated as the Commissioner of the Trial Division by direction of the Commissioner of Correction at 75-20 Astoria Blvd - 1st Floor, East Elmhurst, N.Y. 11370-1131.

> The Office of Administrative Trials and Hearings (OATH) has rules of practice and procedure which are published in Title 48 of the Rules of the City of New York. Copies of OATH's rules are available at the address listed above.

> Your legal rights regarding these charges may be covered under Section 75 of the New York State Civil Service Law.

306.    Mr. Nelson reviewed all of the provisions of law, administrative law and contract provisions that Mr. Tatum referred him to and believes the advice given to him by Mr. Tatum to be true.

**Defendant Kathleen S. Thomson:**

307.    Defendant Thomson knew the extent of her authority in her civil service position as Acting Deputy Commissioner.

308.    Defendant Thomson knew that she was not appointed by the Mayor and therefore not a DOC official responsible for making policy.

309.    Defendant Thomson had a duty to observe the NYC Charter provisions in § 815(f).

310.    As Acting Deputy Commissioner, Defendant Thomson knew that she did not possess the authority to remove or dismiss Mr. Nelson from service.

311.    Defendant Thomson had a duty to observe the Civil Service Law and Rules on removal and other disciplinary actions taken against Mr. Nelson.

312.    Defendant Thomson had a duty to observe Civil Service Law section 75 in Mr. Nelson's case and a duty not to violate its provisions against Mr. Nelson.

313.    Defendant Thomson knew that no official from DOC entered into an official negotiated plea agreement with Mr. Nelson on DOC DR #1614/2021.

314.    Defendant Thomson knew that it was Defendant Jackson law firm that prepared and sent out to Mr. Nelson the negotiated plea agreement that is the subject of this action.

315.    Defendant Thomson knew that such act by Defendant Jackson law firm was, in fact, an arrangement made agencywide between Defendants Boscio, COBA, Jackson law firm, and Defendant Molina, and was done daily in the course of Civil Service Law section 75 disciplinary proceedings taken against COBA members like Mr. Nelson was.

316.    Defendant Thomson knew that if she, in fact, dismissed Mr. Nelson from service instead of Defendant Molina dismissing him, then Defendant City could avoid accountability, responsibility, and damages because she was not a policy maker.

317.    Defendant Thomson knew that Mr. Nelson was not a probationary employee on the date of her termination letter, July 25, 2023.

318.    Defendant Thomson dismissed Mr. Nelson from service in violation of Civil Service Law section 75.

319.    Defendant Thomson dismissed Mr. Nelson from service in violation of Charter § 815.

320.    Defendant Thomson violated the procedural due process clause set forth in the Fourteenth Amendment to the U.S. Constitution when she terminated Mr. Nelson's permanent appointment in the competitive class of the classified Civil Service.

321.    Because Defendant Thompson was not a "body or officer" as defined by CPLR § 7802, her act of removing Mr. Nelson was not subject to CPLR Article 78 review.

322.    Defendant Thomson did not honor the aforementioned duties in the removal action that she took against Mr. Nelson, and which removal action is the subject of the instant court action.

323.    Defendant Thomson's conduct towards Mr. Nelson while she was serving as the Acting Deputy Commissioner was outrageous, with her acts being done with malice or bad motives or reckless indifference to the employment interests of Mr. Nelson.

**Defendant Louis A. Molina:**

324.    Mr. Nelson avers that according to Charter §§ 623 and 815, Defendant Molina had a duty to "manage" his department.

325.    But Molina failed to manage his department and has allowed Defendants Thomson and Rembert to wield his powers, functions and duties as the commissioner, fraudulently and unchecked.

326.    Mr. Nelson avers that according to Civil Service Law section 75, Defendant Molina was mandated to conduct a Section 75 hearing on any charges of misconduct that were made against a subordinate in his department, and preferred to him.

327.    Mr. Nelson avers that DOC DR #1614/2021 were preferred to Molina pursuant to Civil Service Law section 75.

328.    But Defendant Molina did not conduct a hearing on the charges made against Mr. Nelson (DOC DR #1614/2021) as was required under the civil service law.

329.    Instead, Molina failed to manage his department and has allowed many hands (Thomson, Rembert, Troxler, Maldonado, COBA, Jackson Law and K & M law firm) to use his power to discipline subordinates in his department, against Mr. Nelson fraudulently, and against Civil Service Law section 75.

330.    In this regard, Defendant Molina failed to perform a duty enjoined upon him by law.

331.    Defendant Molina's failure to perform his duties enjoined upon him by law caused Mr. Nelson to be deprived of his property right in continued employment.

332.    Defendant Molina knew that as the head of DOC it was his responsibility and duty to manage the personnel of his agency, under Charter § 815, inter alia, laws and City rules and regulations.

333.    Defendant Molina knew that no official from DOC entered into an official negotiated plea agreement with Mr. Nelson on DOC DR #1614/2021.

334.    Defendant Molina knew that it was Defendant Jackson law firm that prepared and sent out to Mr. Nelson the negotiated plea agreement that is the subject of this action.

335.    Defendant Molina knew that such act by Defendant Jackson law firm was, in fact, an arrangement made agencywide between himself, Defendants Boscio, COBA, and Jackson law firm, and was done daily in the course of Civil Service Law section 75 disciplinary proceedings taken against COBA members like Mr. Nelson was.

336.    Upon information and belief, agencywide disciplinary records in DOCs possession will further reveal this fact.

337.   Defendant Molina knew that if Defendant Thomson, in fact, dismissed Mr. Nelson from service instead of himself dismissing Mr. Nelson, then Defendant City could avoid accountability, responsibility, and damages because Thomson was not a policy maker.

338.   Upon information and belief, City records on civil service transactions relating to the removal of civil servants agencywide in DOC will further reveal this fact, by showing, inter alia, if it is indeed Thomson's name or Molina's name attached to Mr. Nelson's wrongful removal.

339.   Defendant Molina knew that Mr. Nelson was not a probationary employee on the date of Defendant Thomson's termination letter, July 25, 2023 and the July 31, 2023 termination date.

340.   Despite his knowing of the aforementioned, Defendant Molina allowed, by his inaction, Mr. Nelson to be injured by Defendant Thomson's unlawful removal act.

341.   Defendant Molina's conduct towards Mr. Nelson while he was serving as the Commissioner of Correction was outrageous, with his acts being done with malice or bad motives or reckless indifference to the employment interests of Mr. Nelson.

**Defendant Asim Rehman:**

342.   Defendant Rehman had a duty to direct the City's Office of Administrative Trials and Hearings (OATH) lawfully and pursuant to Charter §§ 1048, 1049.

343.   Defendant Rehman had a duty to direct the administrative law judges employed in his agency.

344.    Defendant Rehman knew that Civil Service Law section 75 disciplinary hearings were a category of adjudicatory hearings that his agency was forbidden from conducting; pursuant to the express provisions of Charter § 1048.

345.    Defendant Rehman allowed his administrative law judge to influence the outcome of DOC DR No. 1614/2021 against Mr. Nelson, when according to Defendant Troxler, the "judge," that was scheduled for the pre-trial conference in Mr. Nelson's Section 75, Civil Service Law, disciplinary hearing, negotiated with Troxler the results of DOC DR No. 1614/2021.

346.    Defendant Rehman's conduct towards Mr. Nelson while he was serving as the Commissioner and Chief Administrative Law Judge of OATH was outrageous, with his acts being done with malice or bad motives or reckless indifference to the employment interests of Mr. Nelson.

**Defendant Peter Troxler:**

347.    Defendant Troxler, in his capacity as a COBA-retained lawyer through COBA's retainership with Defendant Jackson Law, had a legal responsibility and duty to represent Mr. Nelson legally and equitably in DOC's disciplinary and removal action taken against Mr. Nelson.

348.    Upon information and belief, Defendant Jackson Law assigned Defendant Troxler the task of representing Mr. Nelson.

349.    But at no time did Mr. Nelson hire Defendant Troxler to represent him in the disciplinary case that is DOC DR No. 1614/2021.

350.    Nor did Mr. Nelson retain Defendant Troxler for his legal services.

351.    Likewise, Mr. Nelson did not hire Defendant Jackson or Jackson law firm to represent him in the same disciplinary case.

352.    But Troxler still had a responsibility and duty, owed to Mr. Nelson, to know the Civil Service law applicable to the discipline and removal of civil service workers such as Mr. Nelson was.

353.    And Defendant Troxler had a responsibility and duty, owed to Mr. Nelson, to know the applicable Rules of the City of New York, as those rules related to the discipline and removal of civil service workers such as Mr. Nelson.

354.    Prior to the phone call that Mr. Nelson received from Defendant Troxler in late November 2021, Nelson had never met or heard of Peter Troxler before.

355.    Mr. Nelson assumed that Troxler obtained his phone number from Defendant COBA.

356.    After all, Mr. Nelson was a member of COBA.

357.    Mr. Nelson had no affiliation with Defendants Troxler or Jackson Law.

358.    As stated above, Mr. Nelson did not hire Defendants Troxler and Jackson Law to represent him in DOC DR #1614/2021.

359.    Upon information and belief, Defendants Troxler and Jackson Law were retained by Defendant COBA on an annual or multi-annual retainership arrangement; and, therefore, they worked for COBA. Not for Mr. Nelson.

360.    Upon information and belief, Troxler and Jackson Law was paid by COBA to represent its members in Civil Service Law section 75 disciplinary and removal proceedings.

361.    Defendant COBAs records will show this fact.

362.    Upon information and belief, the disciplinary action taken against Mr. Nelson in DOC DR #1614/2021 was pursuant to Civil Service Law section 75 (or at least on its face it purported to be).

363.    Indeed, Mr. Nelson contends that as a permanent Civil Service employee he was entitled to the protections set forth in Civil Service Law section 75.

364.    In their capacity, Troxler and Jackson Law had a responsibility and duty to represent Mr. Nelson legally and equitably in DOC DR #1614/2021 since they inserted themselves into the matter without consulting with Mr. Nelson first.

365.    But they abrogated that responsibility and duty when Troxler and Jackson Law worked *with* DOC officials and an OATH administrative law judge[4] to settle the *Amended disciplinary charges*, without Mr. Nelson's authority or consent and, which unauthorized settlement purportedly put Mr. Nelson on a two-year limited probationary period with the added loss of thirty (30) of his well-earned and deserved compensation days.

366.    Mr. Nelson avers that such an arrangement was to DOC's benefit and not to his.

367.    Moreover, because Defendant Troxler did not object to or challenge DOC on the many deficiencies[5] (both administratively and legally) in DR #1614/2021, evidences the fact that Defendants Troxler and Jackson Law were in fact working *with* both DOC and OATH, under the guise of an official and properly administered Section 75 proceeding.

---

[4] "OATH" is the acronym for the City's "Office of Administrative Trials and Hearings."

[5] Deficiencies that were later observed by Mr. Tatum, but overlooked by Defendant Troxler.

368.    When in fact, the Civil Service Law section 75 disciplinary action taken against Mr. Nelson in DR #1614/2021 was far from proper, in any respect.

369.    For example, Troxler knew that the allegations in the amended charges claiming that Mr. Nelson, "demonstrat[ed] an excessive use of sick leave", flew in the face of COBA's CBA provisions that provided Mr. Nelson with <u>unlimited sick leave use</u>.

370.    But Troxler did not advance Mr. Nelson's employment interest or, at the very least, raise the CBA provisions on sick leave use against DOC's improper disciplinary action taken against Mr. Nelson.

371.    In fact, Defendant Troxler acted more like an agent (or extended arm) of DOC than a union lawyer, in his unauthorized *representation* of Nelson, and unauthorized handling of DR #1614/2021.

372.    Troxler's telephone call to Mr. Nelson on May 31, 2022, was the equivalent of and tantamount to an official meeting or appointment with a DOC official.

373.    It was Troxler that exercise DOC's administrative function in presenting Mr. Nelson with the NPA.

374.    It was Troxler that purportedly negotiated with DOC, and settled DR #1614/2021 in DOC's favor, without regard to Mr. Nelson's *property interest* in continued employment.

375.    Even more, upon information and belief, it was Defendant Jackson Law's paralegal and office staff that prepared and emailed the NPA to Mr. Nelson, directing him to sign it. Thereby performing (as did Defendant Troxler) another administrative function of DOC. (*See* Ex. 1, at 3).

376.    In effect, Defendant Jackson Law was no different than Defendant Troxler here.

377.    Thus, Mr. Nelson avers that Defendant Jackson Law operated equally as an arm and agent of DOC, and against Mr. Nelson's employment interest in DR #1614/2021.

378.    For these reasons, and on the fact that Defendant Troxler threatened Mr. Nelson with the immediate termination of Nelson's employment if Nelson did not sign the NPA, and the added threat that Mr. Nelson would lose if he took his case to trial, Mr. Nelson avers that the NPA of May 31, 2022 is, and must be declared, null and void by this Court.

379.    Mr. Nelson avers that under the retainership that Jackson Law had with COBA, Troxler had a duty to represent Mr. Nelson's employment interest legally and equitably.

380.    Defendant Troxler willfully and intentionally abrogated his legal duty and obligation to represent Mr. Nelson legally and equitably in DOC's disciplinary action here.

381.    Instead, Defendant Troxler worked with DOC officials Thomson, Rembert, Molina and Carter to secure DOCs interest in the disciplinary action: DR #1614/2021.

382.    Troxler knew that the disciplinary action taken against Mr. Nelson was required to be pursuant to and in accord with Civil Service Law section 75.

383.    Having the knowledge of the type of Civil Service Law proceeding due and required in Mr. Nelson's case, Troxler turned a blind eye when DOC officials perpetrated a disciplinary or removal process against Mr. Nelson that was not pursuant to or in accord with Civil Service Law section 75.

384.    Troxler knew that the original Formal Charges and Specifications were not processed by DOC officials as required and set forth in Directive #4257R-A; and were wholly made by fraud. See Original Charges; annexed hereto as **Exhibit "10"**.

385.    And instead of rejecting the falsely made charges, Defendant Troxler worked *with* Defendants Thomson and Rembert in fraudulently advancing the said disciplinary charges against Mr. Nelson.

**Defendant Mercedes Maldonado:**

386.    Defendant Maldonado, in her capacity as a COBA-retained lawyer through COBA's retainership with Defendant K & M law firm, had a legal responsibility and duty to represent Mr. Nelson legally and equitably in DOC's disciplinary and removal action taken against Mr. Nelson.

387.    Upon information and belief, Defendant K & M law firm assigned Defendant Maldonado the task of representing Mr. Nelson.

388.    At no time did Mr. Nelson hire Defendant Maldonado to represent him in the removal case that is DOC DR No. 1614/2021.

389.    Nor did Mr. Nelson retain Defendant Maldonado for her legal services.

390.    Likewise, Mr. Nelson did not hire Defendant K & M law firm to represent him in the same removal case.

391.    But Maldonado still had a responsibility and duty, owed to Mr. Nelson, to know the Civil Service law applicable to the discipline and removal of civil service workers such as Mr. Nelson was.

392.    And Defendant Maldonado had a responsibility and duty, owed to Mr. Nelson, to know the applicable Rules of the City of New York, as those rules related to the discipline and removal of civil service workers such as Mr. Nelson was.

393.    Upon information and belief, Defendant Maldonado is a competent and established attorney, with over 28 years experience representing Unions and their members. (See Attorney Maldonado's Bio.: Available at, https://kmattorneys.com/leaders.php).

394.    Maldonado received Nelson's disciplinary records relating to the termination of his employment with DOC. See FOIL Response Papers; annexed hereto as **Exhibit "11"**.

395.    Upon information and belief, Maldonado received and *carefully* reviewed the FOIL records that were provided to Def.'s K & M law firm and Maldonado by DOC.

396.    In spite of her *careful* review, and with her many years experience as a labor attorney, Defendant Maldonado told Mr. Nelson that she believed, "an Article 78 is not likely to result in your reinstatement" (*see* Ex. 5).

397.    Mr. Nelson avers that because Maldonado was a competent attorney, knowledgable in labor relations, civil service law, and City rules relating to discipline and removal of City employees, her refusal, therefore, to formally object to DOCs discipline and removal action taken against Mr. Nelson as revealed in, *inter alia*, the FOIL papers, shows clearly that she willfully and intentionally breached her duty that was owed to Mr. Nelson.

398.    Instead of using her legal mind and knowledge in labor relations and administrative laws, Defendant Maldonado put the burden on Mr. Nelson to give her "reasons" to help her "mount a defense" on his behalf.

399.    Defendant Maldonado did not help Mr. Nelson in his employment controversy as a union-retained lawyer is expected to provide assistance to a union member that she is paid by the union to help.

400.    Defendant Maldonado's actions here shown were not indicative of a union-retained lawyer acting in good faith on behalf of a union-member.

401.    By not helping Mr. Nelson in the controversy between him and DOC, Defendant Maldonado helped and worked with DOC for DOC's cause instead.

**Defendant Joey Jackson Law, PLLC:**

402.    Defendant Jackson Law, in its capacity as a COBA-retained law firm, had a legal responsibility and duty to represent Mr. Nelson's employment interest legally and equitably in the DOC disciplinary and removal action, taken against Mr. Nelson.

403.    Upon information and belief, Defendant Jackson Law assigned Defendant Troxler to Mr. Nelson's employment controversy that is the subject of the instant action, which included the NPA stage of the agency disciplinary action.

404.    Upon information and belief, Defendant Jackson Law oversaw Defendant Troxler's handling of Mr. Nelson's case.

405.    In addition, Mr. Nelson avers that Joey Jackson himself, of Defendant Jackson Law knew from day one (or from July 31, 2023) that Mr. Nelson complained of being wrongfully dismissed from service.

406.    Defendant Jackson Law had a legal responsibility and duty, owed to Mr. Nelson, to know the Civil Service law applicable to the discipline and removal of civil service workers such as Mr. Nelson.

407.    Defendant Jackson Law had a legal responsibility and duty, owed to Mr. Nelson, to know the applicable Rules of the City of New York, as those rules related to the discipline and removal of civil service workers such as Mr. Nelson.

408.    Defendant Jackson Law failed Mr. Nelson and breached its legal responsibility and duty owed to Mr. Nelson when after being made aware that Mr. Nelson was removed from his civil service position, and Mr. Nelson's direct complaint that said removal was wrongful and unlawful, Jackson Law, by its head Joey Jackson, did nothing to formally object to or remedy Defendants Thomson and Rembert's disciplinary and removal action imposed on Mr. Nelson; which agency action was against Civil Service law section 75, and City Rules that have the force and effect of law.

409.    Upon information and belief, Defendant Jackson Law worked with DOC and Defendants Thomson and Rembert when it "created" and produced the NPA in its office. (*See* Ex. 1, at 3).

410.    According to the Jackson Law email (Ex. 1), the NPA was created on May 31, 2022 by a paralegal employed at Jackson Law.

411.    Mr. Nelson avers that there is no justifiable reason why Defendant Jackson Law breached its legal responsibility and duty owed to him, but for the fact that Jackson Law was working with DOC and its officials to advance DOC's interest over Mr. Nelson's employment interest, his contractual rights, his Civil Service rights and, his constitutional right to due process of law.

**Defendant Karasyk & Moschella, LLP:**

412.    Defendant K & M law firm, in its capacity as a COBA-retained law firm, had a legal responsibility and duty to represent Mr. Nelson's employment interest legally and equitably in a DOC disciplinary and removal action, taken against Mr. Nelson by DOC.

413.    Upon information and belief, Defendant COBA notified Defendant K & M law firm of Mr. Nelson's employment controversy.

414.    Upon information and belief, Defendant K & M law firm assigned Defendant Maldonado to Mr. Nelson's employment controversy that is the subject of the instant action.

415.    Upon information and belief, Defendant K & M law firm oversaw Defendant Maldonado's handling of Mr. Nelson's case.

416.    Defendant K & M law firm had a legal responsibility and duty, owed to Mr. Nelson, to know the Civil Service law applicable to the discipline and removal of civil service workers such as Mr. Nelson.

417.    Defendant K & M law firm had a legal responsibility and duty, owed to Mr. Nelson, to know the applicable Rules of the City of New York, as those rules related to the discipline and removal of civil service workers such as Mr. Nelson.

418.    Defendant K & M law firm failed Mr. Nelson and breached its legal responsibility and duty owed to Mr. Nelson when after being made aware by COBA that Mr. Nelson was removed from his civil service position, Defendant K & M law firm did nothing to formally object to or remedy Defendants Thomson and Rembert's disciplinary and removal action imposed on Mr. Nelson; which agency action was in direct violation of Civil Service law section 75, Mr. Nelson's collective bargaining agreement and, the Rules of the City of New York which have the force and effect of law.

419.    As a direct result of Defendant K & M law firm's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary

proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

420.    Mr. Nelson avers that there is no justifiable reason why Defendant K & M law firm breached its legal responsibility and duty owed to him, but for the fact that Defendant K & M law firm was working <u>with</u> DOC and its officials to advance DOC's interest over Mr. Nelson's employment interest, his contractual rights, his Civil Service rights and, his constitutional right to due process of law.

**Defendant COBA:**

421.    According to an Executed Contract or, Collective Bargaining Agreement ("CBA"), Defendant COBA was recognized by Defendant City as Mr. Nelson's <u>sole representative</u> for CBA matters during Mr. Nelson's employment.

422.    The specific text of the CBA reads,

> The City recognizes the Union as the sole and exclusive collective bargaining representative for the unit consisting of the employees of New York City in the title of "Correction Officer."

See *Id*. Article I Section 1: (available at, *https://www.nyc.gov/assets/olr/downloads/pdf/ collectivebargaining/coba-executed-contract-2019-2022.pdf*).

423.    Mr. Nelson contends that through this contractual relationship, Defendant City had a legal duty and contractual obligation to notify Defendant COBA, through DOC, whenever any adverse personnel action was taken against Mr. Nelson by *DOC*.

424.    On this fact, Mr. Nelson avers that Defendant COBA was notified by DOC of its disciplinary action taken against Mr. Nelson in DOC DR #1614/2021, and the summary suspension from duty without pay action imposed on him September 17, 2021.

425.    Mr. Nelson avers that the *notification* between DOC and Defendant COBA constituted a meeting of the minds between the two.

426.    Mr. Nelson avers that DOC, on behalf of Defendant City, and in keeping with the City's contractual relationship (the CBA), provided Defendant COBA with all papers and documents involved in DR #1614/2021; inclusive of the Formal Charges and Specifications made against Mr. Nelson.

427.    And, the Notice of Summary Suspension From Duty documents as well.

428.    Therefore, Defendant COBA knew that the charges as written in DR #1614/2021 were fraudulently made; being in direct conflict with the requirements and mandate of DOC Directive #4257R-A.

429.    But Defendant COBA willfully failed to act on the knowledge that it had at the time, and before Mr. Nelson suffered the full 30 day suspension from duty without pay.

430.    Mr. Nelson avers that because the CBA was between Defendants City and COBA, and because COBA retained Defendants Jackson law firm and K & M law firm, that it was COBAs duty to notify the defendant law firms in Mr. Nelson's case.

431.    On this fact, Mr. Nelson avers that Defendant COBA notified Defendant Jackson Law prior to Defendant Troxler calling Mr. Nelson in late November 2021.

432.    And before Troxler was assigned to Mr. Nelson's case by Defendant Jackson Law.

433.    Mr. Nelson avers that during this notification period, that there was a meeting of the minds between Defendants COBA, Jackson Law, and Troxler.

434.    In effect, Mr. Nelson contends, Defendants COBA, Jackson Law, and Troxler, worked *with* DOC to further DOC's interest in DOC DR #1614/2021; to the unlawful deprivation of Mr. Nelson's federal constitutional right to procedural due process of law.

435.    Furthermore, as of the filing of the instant action in this Court, Mr. Nelson has not received any response from Defendant COBA whatsoever to his timely filed official grievance (Ex. 7).

436.    Defendant COBA was equally made aware of DOC's adverse personnel action taken against Mr. Nelson in DOC DR #2266/2022.

437.    But COBA took no action to defend Mr. Nelson's employment rights or to enforce the sick leave provisions in the CBA on Mr. Nelson's behalf.

438.    Defendant COBA's willful and intentional act of not acting on Mr. Nelson's behalf in DR #2266/2022, even though they had knowledge that DOC was taking an adverse personnel action against Mr. Nelson in direct violation of provisions within its CBA, show plainly that Defendant COBA was working with DOC and Defendant City in a disciplinary and removal process that was in direct violation of the provisions set forth in Civil Service Law section 75.

439.    Defendant COBA's breach of its contractual duty and legal responsibility and obligation to protect Mr. Nelson's employment rights, resulted in harm to Mr. Nelson.

440.    Mr. Nelson avers that there is no justifiable reason why Defendant COBA breached its contractual responsibility and duty owed to him, but for the fact that COBA was working with DOC and its officials to advance DOC's interest over Mr. Nelson's.

**Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and K & M law firm:**

441.    Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and K & M law firm each had a fiduciary duty to enforce the provisions of the COBA collective bargaining agreement in DOC DR No. 1614/2021 (as amended).

442.    Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and K & M law firm each had a duty of care to enforce the provisions of the COBA collective bargaining agreement, to observe Civil Service Law § 75, and all applicable City rules relevant laws, and Charter provisions involved in the disciplinary action wrongfully taken against Mr. Nelson under DOC DR No. 1614/2021 (as amended).

443.    Because Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and K & M law firm were fully aware of the fact that Defendant Thomson had no authority under law, rule, or Charter provision to dismiss Mr. Nelson from service, but failed to prevent or correct the wrong that had been done against Mr. Nelson, each of these defendants breached their aforementioned duties owed to Mr. Nelson.

444.    By their actions and inactions in Mr. Nelson's case, Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and K & M law firm worked with Defendant Thomson, Molina, and the City to constructively remove Mr. Nelson from service wrongfully.

445.    Defendants Boscio, COBA, Troxler, Jackson, Jackson law firm, Maldonado, and

K & M law firm's conduct towards Mr. Nelson while serving as union-president, union,

union-retained lawyers and law firms was outrageous, with their acts being done with

malice or bad motives or reckless indifference to the employment interests of Mr. Nelson.

**Defendant Carter:**

446.    Mr. Nelson avers that Defendant Carter initiated the removal action against him in

direct violation of Civil Service Law section 75.

447.    According to her Letter request (Ex. 8) and attached PDR, Defendant Carter

requested the termination of Mr. Nelson's employment under false pretenses.

448.    The PDR states, in relevant part,

> **REASON FOR REFERRAL:** Anna M. Kross Center
> (AMKC) is requesting termination for Correction Officer
> Troix Nelson #13152 for violation of a negotiated plea
> agreement (NPA). On May 31, 2022 C.O. Nelson entered
> into a NPA with the Department of Correction, under
> Settlement DR #1614/2022 [*sic*] stipulating C O Nelson
> serve a limited probation for a period of two years limited
> to time and leave violations. Since her [*sic*] NPA C.O
> Nelson has be [*sic*] out on sick leave, LWOP, AWOL, and
> annual leave. (Emphasis in Original).

449.    For reasons stated below as it relates to Defendant Troxler, Mr. Nelson avers that the

NPA mentioned in Defendant Carter's Letter request, is null and void.

450.    Defendant Carter's Letter request claimed that her request was for Mr. Nelson's

"violation of a negotiated plea agreement."

451.    Mr. Nelson contends that as the Commanding Officer of AMKC, Defendant Carter

had a duty pursuant to Mayoral Executive Order No. 16 (July 26, 1978)(As Amended) to

proffer informal disciplinary proceedings to Mr. Nelson with the first allegation of AWOL. While that single allegation was deemed a "minor violation" under DOC Directive #4257R-A, titled "Command Discipline". See MEO #16 of 1978 (as amended), at Section 6.

452.    Under Directive #4257R-A, one instance of AWOL is a "Schedule B" violation. (DOC Directive #4257R-A, § V(F)(2)(b), at p. 8).

453.    And under Directive #4257R-A, five AWOL's are a "Schedule "D" violation. (DOC Directive #4257R-A, § V(F)(4)(f), at p. 9). See DOC Directive #4257R-A, Pages 1, 8, 9; annexed hereto as **Exhibit "9"**.

454.    According to Directive #4257R-A, the Schedule "B" violation would have only subjected Mr. Nelson to a loss of two (2) vacation days or, loss of two (2) compensatory days. *Id.* at § V(B)(2)(a)(b).

455.    And the Schedule "A" violation would have subjected Mr. Nelson to a loss of four (4) vacation days or, loss of four (4) compensatory days. *Id.* at § V(B)(4)(a)(b).

456.    Similarly, Defendant Carter's claim in the PDR records twenty-four (24) late occasions against Mr. Nelson.

457.    But she did not proffer informal disciplinary proceedings to Mr. Nelson as she was required to do pursuant to MEO #16 and, under DOC's Command Discipline directive.

458.    Had she followed the directive, Mr. Nelson could have considered accepting the offer for the minor charges, in lieu of formal disciplinary proceedings being made against him.

459.    Or, opt for the formal charges and a Civil Service Law Section 75 proceeding to determine his guilt or innocence.

460. Mr. Nelson contends that MEO #16 of 1978 (as amended), § 6, created a right to him

for, at the very minimum, *an offer* to accept a predetermine (or Scheduled) penalty.

461. The specific provisions in MEO #16 that Mr. Nelson relies on for his claim that a

right has been granted to him that he should have been *offered* a choice on the first to the

fifth AWOL charge, is found at Section 6(a)(b); where MEO #16 reads, in relevant part,

> Section 6. Informal Disciplinary Proceedings
>
> (a) Each agency head shall, with the advice of the Commissioner, establish appropriate reporting requirements, disposition standards and other administrative procedures for informal disciplinary proceedings to permit the fair and expeditious resolution of minor violations of the standards of conduct established by such agency head under the Order, without prejudice to any rights provided to officers or employees of the City by law or by contract.
>
> (b) Informal disciplinary proceedings **may be undertaken on the following conditions**: (i) **the employee** or official who is the subject of such proceedings **shall consent to** accept a predetermined penalty upon a finding of cause in lieu of the filing of a formal disciplinary charge … . [Emphasis added].

462. Mr. Nelson avers that in order for him to "consent to accept a predetermined penalty

upon a finding of cause in lieu of the filing of a formal disciplinary charge" (*id.*),

Defendant Carter was required to proffer a choice to him.

463. But as shown hereinabove, she did not proffer a choice to Mr. Nelson, at all.

464. Instead, Carter filed the PDR paperwork under false pretenses for the sole purpose of

removing Mr. Nelson in violation of Civil Service Law section 75.

465.    Therefore, according to MEO #16 and DOC's own Command Discipline directive, Def. Carter's stated reasons for requesting Mr. Nelson's dismissal from service were, in fact, false and fraudulent statements that violated Civil Service Law section 75's procedures for removing Civil Service employees granted the protections of this law; such as and against Mr. Nelson.

466.    Defendant Carter's action against Mr. Nelson also constitute a fraud under Defendant City's Charter, at § 1116.

467.    The specific provisions there relied upon by Mr. Nelson for this fraud claim reads,

> § 1116.  Fraud; neglect of duty; willful violation of law relative to office.
>
> a. Any council member or other officer or employee of the city who shall willfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall forfeit such office or employment, and be excluded forever after from receiving or holding any office or employment under the city government.
>
> b. Any officer or employee of the city or of any city agency who shall knowingly make a false or deceptive report or statement in the course of duty shall be guilty of a misdemeanor and, upon conviction, forfeit such office or employment.

468.    As a result of Defendant Carter's aforementioned conduct against Nelson, Nelson has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

469.    Defendant Carter knew the charged alleged AWOL days were beyond the time for bringing disciplinary action against Mr. Nelson, but she still requested that his employment be terminated.

470.    Defendant Carter knew that the COBA collective bargaining agreement provisions provided Mr. Nelson with unlimited sick leave use, but she still cited "excessive sick leave" and "continuous sick leave" use as reasons for her request that Mr. Nelson's employment be terminated.

471.    Defendant Carter's conduct towards Mr. Nelson while she was serving as the Warden was outrageous, with her acts being done with malice or bad motives or reckless indifference to the employment interests of Mr. Nelson.

**Defendant City of New York:**

472.    Defendant City has a policy, practice, and custom of imposing Civil Service Law section 75 penalties on DOC employees in violation of Civil Service Law section 75 and Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978).

473.    Defendant City accomplishes this policy, practice, and custom through, *inter alia*, a fear and intimidation campaign against its employees.

474.    It begins with administratively charging an employee falsely.

475.    The charges do not have to be drawn up in a cohesive manner, they just have to be drawn up on an official document or form and allege misconduct; no matter how clearly frivolous the allegations are shown to be.

476.    Mr. Nelson avers that once the charges are drawn up, DOC's fraudulent disciplinary machinery goes into full swing and effect.

477.   A Section 75 penalty of dismissal from service is threatened or, an employee is abruptly suspended from duty without pay; like Mr. Nelson was, under the guise and false pretense of having been charged with formal disciplinary charges and specifications.

478.   Instead of notifying Mr. Nelson that the disciplinary action taken against him was pursuant to Civil Service Law section 75 so that he may properly prepare his defenses, the "Notice of Pleading and Hearing" form that accompanied the charges given to him state the following:

> Your legal rights regarding these charges **may** be covered under Section 75 of the New York State Civil Service Law. [Emphasis added].

(*See* Ex. 10, p. 2).

479.   This is a part of the City's policy, practice, and custom scheme.

480.   The notice then went on to misdirect Mr. Nelson to report to *OATH*, for a hearing on DR #1614/2021.

481.   The notice also misdirected Mr. Nelson and instructed him to have his representative, if any, file a notice of appearance with OATH.

482.   Mr. Nelson avers that Civil Service Law section 75 mandates that the hearing be held by the officer having the power to remove. *Id.* at subdivision 2.

483.   Which was Defendant Molina.

484.   No one at OATH possessed the "power to remove" Mr. Nelson from service, in accord with Civil Service Law section 75.

485.   And therefore, the instructions on the Notice were deceptive and a fraud.

486.    This deceptive and fraudulent instruction, Mr. Nelson contends, was a part of the City's unlawful policy scheme to defraud him of his right to due process and continued employment.

487.    Under subdivision 2 of Civil Service Law section 75 it reads, in relevant part,

> The hearing upon such charges shall be held by the officer or body having the power to remove the person against whom such charges are preferred … .

488.    On this provision of law, Mr. Nelson contends that there should never have been any negotiation with an OATH administrative law judge with respect to the DOC disciplinary charges made against him in DR #1614/2021, as Defendant Troxler stated was in fact what happened.

489.    Mr. Nelson avers that the OATH ALJ that presided over his pre-trial conference on or about December 27, 2021 had no legal authority to be involved with his disciplinary matter whatsoever.

490.    But as part of the City's policy, practice, and custom scheme, it uses OATH and its administrative law judges to instill fear in City employees at DOC, as well as to cause their unlawful removal or to be unlawfully penalized.

491.    Upon information and belief, the OATH ALJ's instill fear by consistently making recommendations in Section 75 hearings against correction officers; even while not having legal jurisdiction to conduct the Section 75 hearing.

492.    The reports and recommendations made by OATH ALJ's in Section 75 hearings are then published online to the World Wide Web for all other City employees to see. See

OATH Decisions (Available at, https://www.nyc.gov/site/oath/trials/search-decisions.page).

493. This is a part of the City's policy scheme.

494. OATH publishes correction officers' disciplinary records without regard to the governing law relating to the making public of law enforcement disciplinary records; i.e., Public Officers Law §§ 86, 87.

495. Upon information and belief, OATH publishes Section 75 proceedings pursuant to its Rules of Practice: 48 RCNY § 1-49.

496. Mr. Nelson contends that this is both a conflict and illegal but that Defendant City allows this in order to instill fear in its employees citywide and to remove employees without following Section 75 procedures.

497. Upon information and belief, in each instance that OATH publishes the result of a Section 75 hearing online, there was no actual FOIL request made to OATH to do so.

498. OATH simply violates Public Officers Law sections 86 and 87, and the subject City employee's right (Mr. Nelson's) to privacy in their law enforcement disciplinary records.

499. Upon information and belief, OATH is actually mandated under its own enabling legislation, Charter § 1048, not to conduct adjudicatory hearings such as a Civil Service Law section 75 hearing.

500. But it does so nonetheless without objection from Defendants COBA, Jackson Law, K & M law firm, Troxler, Boscio, COBA, or Maldonado.

501. OATH's enabling legislation, 48 RCNY § 1048 reads, in relevant part,

> There shall be an office of administrative trials and hearings which **shall conduct** adjudicatory hearings for all agencies of the city **unless otherwise provided for by** executive order, rule, **law** or pursuant to collective bargaining agreements.
> [Emphasis added].

502.   On this provision of law, Mr. Nelson contends that the words OATH "shall conduct adjudicatory hearings for all agencies of the city unless otherwise provided for by… law" mandates that OATH <u>not</u> conduct an adjudicatory hearing such as a Section 75 hearing where the conduct of that type of hearing, **the law** <u>provides for</u> **who may conduct it**.

503.   And as stated above, the relevant provision of law in Civil Service Law section 75 provides that, "The hearing upon such charges **shall be held by the officer** or body **<u>having the power to remove</u>** the person against whom such charges are preferred" [emphasis added].

504.   Mr. Nelson learned this information through his consultation from Mr. Tatum.

505.   Therefore, Mr. Nelson contends, OATH should not have been involved with DOC DR #1614/2021, but for Defendant City's policy, practice, and custom, of knowingly violating Civil Service Law section 75 to impose the penalties provided in this law against its employees unjustly. Which is what was done to Mr. Nelson in this case.

506.   Mr. Nelson contends that Defendant COBA, in all the years of its present administration and, its prior administrations, has never objected to the City's policy, practices, and customs as shown hereinabove. But was a active participant in the scheme against its own membership including Mr. Nelson in the instant matter.

507.    Mr. Nelson contends that Defendant Jackson Law, in all the years of its present retainership with COBA has never objected to the City's policy, practices, and customs as shown hereinabove. But was a willing and active participant in the scheme.

508.    Mr. Nelson contends that Defendant K & M law firm, in all the years of its present retainership with COBA has never objected to the City's policy, practices, and customs as shown hereinabove. But was a willing and active participant in the scheme.

509.    Mr. Nelson contends that Defendant Troxler, in all the years of his employment as a COBA retained lawyer has never objected to the City's policy, practices, and customs as shown hereinabove. But was a willing and active participant in the scheme.

510.    Mr. Nelson contends that Defendant Maldonado, in all the years of her employment as a COBA retained lawyer, has never objected to the City's policy, practices, and customs as shown hereinabove. But was a willing and active participant in the scheme.

511.    Aa a direct result of Defendant City's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, pain and suffering, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

## FIRST CLAIM FOR RELIEF

### (Violation of Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983 and Civil Service Law Section 75)

1. **Defendant Kathleen S. Thomson, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

### ARGUMENT

512.   Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

513.   Defendant Kathleen S. Thomson, acting under color of law, violated Plaintiff's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, when she terminated Mr. Nelson's employment based on disciplinary charges preferred to Defendant Molina in violation of Civil Service Law § 75, and caused Plaintiff to be deprived of his constitutionally protected *property interest* in continued employment; causing him injury.

514.   The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

515.   Pursuant to N.Y. Civil Service Law ("CSL") § 75 subdivision 1(a), Mr. Nelson was afforded the protections set forth therein in removal and other disciplinary actions brought against him by his employer: Defendant City, and its Department of Correction. See *Dwyer v. Regan,* 777 F.2d 825, 829 (2d Cir. 1985); *Burka v. New York City Transit Auth.,* 739 F. Supp. 814, 835 (S.D.N.Y. 1990).

516.   Accordingly, Mr. Nelson avers that he had a property interest in continued employment and could not be subjected to any of the Section 75 disciplinary penalties except in accordance with the provisions set forth therein. See *Ciambriello v. County of Nassau,* 292 F.3d 307, 313-314 (2d Cir. 2002).

517.   According to New York City Charter ("Charter") Chapter 25, § 621, Defendant Molina was the head of DOC.

518.   Mr. Nelson avers that Defendant Kathleen S. Thomson, in her official capacity as an Acting Deputy Commissioner (¶ 12) did not possess the requisite power to remove Mr. Nelson from his Civil Service position as a correction officer.

519.   Mr. Nelson contends that according to NYC Charter §§ 621 and 815(f), only Defendant Molina in his official capacity as commissioner of correction possessed the power to appoint and remove subordinate officers and employees within the DOC, subject to the provisions of the Civil Service Law.

520.   And that the only civil service law applicable to Mr. Nelson's removal from service for incompetency or misconduct was Civil Service Law § 75.

521.   Mr. Nelson avers that according to the Termination Letter, Def. Thomson made a final determination to terminate his employment.

522.   Mr. Nelson contends that because Defendant Thomson was not a "body or officer" as defined by CPLR § 7802, that he could not bring an Article 78 proceeding against Defendant Thomson in her capacity as an acting Deputy Commissioner.

523.   According to the NYC Charter, which reads in relevant part,

> The heads of all agencies shall, except as otherwise provided by law, have power to appoint and remove, subject to the provisions of the civil service law.

*Id,* at § 815(f).

524.   And NYC Charter ("Charter") section 621 reads,

> Department; commissioner. There shall be a department of correction the head of which shall be the commissioner of correction.

525.    Based on these provisions in the Charter, Mr. Nelson contends that Def. Thomson knowingly exceeded her authority in removing him from service and exercised power that she did not lawfully possess.

526.    Moreover, Defendant Molina did nothing to stop or prevent her from exercising his power; which power was granted to him by the NYC Charter.

527.    Mr. Nelson contends that Defendant Molina's powers are also set forth in Section 623 of the Charter; and that Defendant Thomson did not possess any of the powers provided therein.

528.    Defendant Thomson knew, by her official title, and otherwise, that she did not possess the powers of the commissioner of correction to remove Mr. Nelson from service. But she acted as if she did and removed Mr. Nelson nonetheless, on allegations of misconduct and alleged *excessive* sick leave use.

529.    Defendant Thomson knew that there was no hearing on incompetency or misconduct charges held to determine any Formal Charges and Specifications that were made against Mr. Nelson.

530.    And Defendant Thompson knew that there was no record made of any such hearing, and that there was no findings of fact made by an impartial decision maker or, hearing officer, in a lawful incompetency or misconduct proceeding under Civil Service Law § 75.

531.    Because there was no such hearing held in Mr. Nelson's case, at all.

532.    Mr. Nelson avers that it is well known in DOC (and abroad) that correction officers have unlimited sick leave provisions in their collective bargaining agreement.

533.    Specifically, the COBA Collective Bargaining Agreement reads, in relevant part,

> Section 1.
> ARTICLE X - LEAVES
>
> Sick Leave
>
> (i) Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect which is service-connected pursuant to Section 9-117.1(a) of the Administrative Code.
>
> (ii) Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect, whether or not service-connected.
>
> See COBA Executed Contract; available at https://www.nyc.gov/
> assets/olr/downloads/pdf/collectivebargaining/coba-
> executed-contract-2019-2022.pdf.

534.    Based on these provisions within his collective bargaining agreement, Mr. Nelson avers that DOC could not lawfully charge him with "excessive" sick leave use.

535.    And that Defendant Thomson was fully aware of the above provisions in the CBA prior to her removing Mr. Nelson from service on DOC DR #1614/2021.

536.    Additionally, Mr. Nelson avers that he was following and guided by the instructions of his Treating Physician when he used his sick leave provisions in the COBA CBA.

537.    As to the unofficial NPA, Mr. Nelson avers that the DOC NPA was never presented to him by any DOC uniformed supervisor or official, and that he did not give consent to Defendant Troxler to negotiate a settlement of DOC's charges in DR #1614/2021.

538.    Mr. Nelson would have never negotiated an arrangement like Def. Troxler did, that resulted in Mr. Nelson serving another two-year probationary period: limited or full.

539.    Nor would Mr. Nelson have negotiated with DOC the surrendering of thirty (30) of his compensation days.

540.    Mr. Nelson would have instead demanded a Civil Service Law § 75 hearing to settle the charges through a proper disciplinary proceeding before an impartial Hearing Officer.

541.    Mr. Nelson avers that because he was not consulted or offered the terms of the NPA by any DOC official, that it was Defendants COBA, Jackson Law, and Troxler who worked with DOC officials to bring about the NPA that benefited Defendant City and DOC.

542.    Their arrangement in that NPA did not benefit Mr. Nelson.

543.    Mr. Nelson avers that Defendant Thomson's act of removing him from service as shown hereinabove, violated, *inter alia*, NYC Charter § 815(f), Rules of the City of New York (55 RCNY, Appendix A) 5.2.7, Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

544.    For the reasons stated above, Mr. Nelson contends that Defendant Thomson's act of removing him from service also constitutes an act of fraud, under Charter § 1116.

545.    Defendant Thomson had a duty of care owed to Mr. Nelson that required she observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

546.    Defendant Thomson negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service

Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

547.    Aa a direct result of Def. Thomson's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

548.    Accordingly, Defendant Thomson is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Thomson's negligent breach of her aforementioned duties owed to Mr. Nelson.

549.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**2. Defendant Sherrie Rembert, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

**ARGUMENT**

550.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

551.    Defendant Sherrie Rembert, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

552.    Upon his review of the documents that Mr. Nelson received from his FOIL request, Mr. Nelson discovered the fact that on July 25, 2023, Defendant Rembert made a "final" determination to terminate Mr. Nelson's employment.

553.    This fact was evidenced by Defendant Rembert's signature adjacent to the word "Termination" under Section Heading — "Assistant Chief's Final Determination," on a DOC document titled, <u>Personnel Determination Review</u> (or, "PDR");[6] which was attached to Defendant Carter's Letter request to Defendant Thomson for Mr. Nelson's termination. <u>See</u> DOC's Personnel Determination Review Form; annexed hereto as **Exhibit "8"**.

554.    As stated and shown above, Mr. Nelson avers that Defendant Rembert did not possess the power to remove him from service.

555.    Nor did she possess the power to make a <u>final determination</u> with respect to the removing of Mr. Nelson from service. This is true simply because she was not the agency head and/or the commissioner of correction.

556.    Mr. Nelson avers that Defendant Rembert willfully and knowingly violated Charter § 815(f), when she performed a function of the head of DOC but without lawful authority to execute her signature on the PDR.

557.    Mr. Nelson avers that Rembert knew, by reason of her title, education and training, that she did not possess the power to make a final determination in the removing action of Mr. Nelson from service.

---

[6] The so-called PDR system is an unfair DOC policy that is manifestly self-serving to DOC as it does not provide a mechanism to challenge the arbitrary decisions made in the course of a PDR action. The specific language of this DOC system can be found in DOC Teletype Order No. HQ - 02422-0 (09/21/05).

558.    Defendant Rembert also knew that there had been no Civil Service Law section 75 disciplinary hearing held to determine any allegations of rule violations that were made against Mr. Nelson.

559.    Defendant Rembert knew that there had been no finding of guilt rendered against Mr. Nelson by an impartial fact finder, on any set of DOC Formal Charges and Specifications that were made against Nelson.

560.    Mr. Nelson avers that Defendant Rembert's role in his removal from service did not follow any of the lawful procedures set forth in Civil Service Law section 75.

561.    Defendant Rembert was not a deputy of Defendant Molina, as authorized by Section 622 of the Charter.

562.    And Defendant Rembert was not deputized by Defendant Molina to operate on his behalf or, to execute her signature on the self-serving PDR.

563.    Mr. Nelson avers that Defendant Rembert violated the provisions of Civil Service Law section 75 in the removal action that removed him from service on allegations of misconduct, but without a hearing appropriate to the charges that were made against him.

564.    Mr. Nelson avers that Rembert committed a fraudulent act when she signed the PDR.

565.    Defendant Rembert had a duty of care owed to Mr. Nelson that required she observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

566.    Defendant Rembert negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud

Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

567.     Aa a direct result of Defendant Rembert's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

568.     Accordingly, Defendant Rembert is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Rembert's negligent breach of her aforementioned duties owed to Mr. Nelson.

569.     Mr. Nelson avers that he is therefore, entitled to relief in this Court.

   **3.   Defendant Louis A. Molina, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

**ARGUMENT**

570.     Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

571.     Defendant Louis A. Molina, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

572.    At all times relevant to this litigation, Defendant Molina had a duty of care owed to Mr. Nelson that required he observe and obey all relevant laws, City rules, Charter provisions, and COBA CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

573.    Defendant Molina negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

574.    Aa a direct result of Defendant Molina's illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with his position.

575.    Accordingly, Defendant Molina is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Molina's negligent breach of his aforementioned duties owed to Mr. Nelson.

576.    As a result of Defendant Molina's aforementioned conduct against Nelson, Nelson has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

577.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**4. Defendant Charisma Carter, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

## ARGUMENT

578.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

579.    Defendant Charisma Carter, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

580.    Defendant Carter had a duty of care owed to Mr. Nelson that required she observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful removal action that was taken against Mr. Nelson based on her request and DOC DR No. 1614/2021.

581.    Defendant Carter negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

582.    Aa a direct result of Defendant Carter's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction

officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

583.    Accordingly, Defendant Carter is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Carter's negligent breach of her aforementioned duties owed to Mr. Nelson.

584.    As a result of Defendant Carter's aforementioned conduct against Nelson, Nelson has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

585.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**5.  Defendant Peter Troxler, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

**ARGUMENT**

586.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

587.    Defendant Peter Troxler, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

588.    Defendant Troxler worked with and assisted Defendants Thomson, Molina, Carter and Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

589.    Defendant Troxler had a duty of care owed to Mr. Nelson that required he observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

590.    Defendant Troxler negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

591.    Aa a direct result of Defendant Troxler's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

592.    Accordingly, Defendant Troxler is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Troxler's negligent breach of his aforementioned duties owed to Mr. Nelson.

593.    As a direct result of Defendant Troxler's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer loss of career, shame, humiliation, loss of financial benefits, loss of

future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

594.     Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**6.  Defendant Mercedes Maldonado, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

### ARGUMENT

595.     Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

596.     Defendant Mercedes Maldonado, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

597.     Defendant Maldonado worked with and assisted Defendants Thomson, Molina, Carter and Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

598.     Defendant Maldonado had a duty of care owed to Mr. Nelson that required she observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful removal action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

599.    Defendant Maldonado negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

600.    Aa a direct result of Defendant Maldonado's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

601.    Accordingly, Defendant Maldonado is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Maldonado's negligent breach of her aforementioned duties owed to Mr. Nelson.

602.    As a direct result of Defendant Maldonado's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, post removal date, Mr. Nelson was caused to suffer permanent loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

603.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**7.  Defendant Joey Jackson Law PLLC, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

### ARGUMENT

604.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

605.    Defendant Joey Jackson Law, PLLC, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

606.    Defendant Jackson law firm worked with and assisted Defendants Thomson, Molina, Carter and Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

607.    Defendant Jackson law firm had a duty of care owed to Mr. Nelson that required they observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful removal action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

608.    Defendant Jackson law firm negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to

the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

609.   Aa a direct result of Defendant Jackson law firm's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

610.   Accordingly, Defendant Jackson law firm is liable in damages to Mr. Nelson in excess of $5,000,000, the exact amount to be proven at trial, arising out of Defendant Jackson law firm's negligent breach of their aforementioned duties owed to Mr. Nelson.

611.   As a direct result of Defendant Jackson law firm's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer permanent loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

612.   Mr. Nelson avers that he is therefore, entitled to relief in this Court.

8. **Defendant Karasyk & Moschella, LLP, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

## ARGUMENT

613.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

614.    Defendant K & M law firm, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

615.    Defendant K & M law firm worked with and assisted Defendants Thomson, Molina, Carter and Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

616.    Defendant K & M law firm had a duty of care owed to Mr. Nelson that required they observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful removal action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

617.    Defendant K & M law firm negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to

the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

618.    Aa a direct result of Defendant K & M law firm's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

619.    Accordingly, Defendant K & M law firm is liable in damages to Mr. Nelson in excess of $5,000,000, the exact amount to be proven at trial, arising out of Defendant K & M law firm's negligent breach of their aforementioned duties owed to Mr. Nelson.

620.    As a direct result of Defendant K & M law firm's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer permanent loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

621.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**9. Defendant Correction Officers' Benevolent Association, Inc., acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

## ARGUMENT

622.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

623.    Defendant Correction Officers' Benevolent Association, Inc., acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

624.    Defendant COBA worked with and assisted Defendants Thomson, Molina, Carter and Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service Law section 75, and the due process clause of the Fourteenth Amendment to the Federal Constitution.

625.    Defendant COBA had a duty of care owed to Mr. Nelson that required they observe and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the wrongful removal action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

626.    Defendant COBA negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

627.    Aa a direct result of Defendant COBA's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial

benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

628.    Accordingly, Defendant COBA is liable in damages to Mr. Nelson in excess of $5,000,000, the exact amount to be proven at trial, arising out of Defendant COBAs negligent breach of their aforementioned duties owed to Mr. Nelson.

629.    As a direct result of Defendant COBA's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer permanent loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

630.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**10.    Defendant Benny Boscio, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

631.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

632.    Defendant Benny Boscio, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

633.    Defendant Boscio worked with and assisted Defendants Thomson, Molina, Carter and
Rembert, to constructively dismiss Mr. Nelson from service in violation of Civil Service
Law section 75, and the due process clause of the Fourteenth Amendment to the Federal
Constitution.

634.    Defendant Boscio had a duty of care owed to Mr. Nelson that required they observe
and obey all relevant laws, City rules, Charter provisions, and CBA provisions in the
wrongful removal action that was taken against Mr. Nelson under DOC DR No.
1614/2021.

635.    Defendant Boscio negligently breached those duties owed to Mr. Nelson on more
than one occasion and intentionally participated in an illegal scheme to defraud
Mr. Nelson out of his right to continued employment under Section 75, Civil Service
Law, and his right to procedural due process of law under the Fourteenth Amendment to
the U.S. Constitution, and such breaches were the actual and proximate cause of harm to
Mr. Nelson.

636.    Aa a direct result of Defendant Boscio's unauthorized and illegal conduct here shown,
Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial
benefits, loss of future salary, loss of opportunity for career advancement as a correction
officer, and financial damages due to the loss of pay and benefits associated with the
Civil Service position of correction officer.

637.    Accordingly, Defendant Boscio is liable in damages to Mr. Nelson in excess of
$100,000, the exact amount to be proven at trial, arising out of Defendant Boscio's
negligent breach of his aforementioned duties owed to Mr. Nelson.

638.    As a direct result of Defendant Boscio's willful failure to protect and defend Mr. Nelson's legal right to a proper and lawful Civil Service Law section 75 disciplinary proceeding, and Mr. Nelson's contractual right to unlimited sick leave, Mr. Nelson was caused to suffer permanent loss of career, shame, humiliation, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

639.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**11. Defendant Asim Rehman, acting under color of law, violated Plaintiff's Fourteenth Amendment Liberty Interest Right**

640.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

641.    Defendant Asim Rehman, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

642.    At all times relevant to this litigation, Defendant Rehman had a duty of care owed to Mr. Nelson that required he observe and obey all relevant laws, City rules, Charter provisions, and COBA CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

643.    Defendant Rehman negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud

Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

644.    Aa a direct result of Defendant Rehman's illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with his position.

645.    Accordingly, Defendant Rehman is liable in damages to Mr. Nelson in excess of $100,000, the exact amount to be proven at trial, arising out of Rehman's negligent breach of his aforementioned duties owed to Mr. Nelson.

646.    As a result of Defendant Rehman's aforementioned conduct against Nelson, Nelson has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

647.    Mr. Nelson avers that he is therefore, entitled to relief in this Court.

**SECOND CLAIM FOR RELIEF**

**(Violations of Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978))**

**12. Defendant City of New York, acting under color of law, violated Plaintiff's Fourteenth Amendment Right to Procedural Due Process of Law**

**ARGUMENT**

648.    Mr. Nelson realleges and incorporates as though fully set forth herein, each and every allegation contained above.

649.    Defendant City of New York, acting under color of law, violated Mr. Nelson's right to procedural due process of law, guaranteed to him under the Fourteenth Amendment to the U.S. Constitution, and caused Mr. Nelson to be deprived of his constitutionally protected *property interest* in continued employment.

650.    At all times relevant to this litigation, Defendant City had a duty to observe and obey Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978).

651.    At all times relevant to this litigation, Defendant City had a duty of care owed to Mr. Nelson that required it observe and obey all relevant laws, caselaws, City rules, Charter provisions, and COBA CBA provisions in the wrongful disciplinary action that was taken against Mr. Nelson under DOC DR No. 1614/2021.

652.    Defendant City negligently breached those duties owed to Mr. Nelson on more than one occasion and intentionally participated in an illegal scheme to defraud Mr. Nelson out of his right to continued employment under Section 75, Civil Service Law, and his right to procedural due process of law under the Fourteenth Amendment to the U.S. Constitution, and such breaches were the actual and proximate cause of harm to Mr. Nelson.

653.    Aa a direct result of Defendant City's illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with his position.

654.   Accordingly, Defendant City is liable in damages to Mr. Nelson in excess of $30,000,000, the exact amount to be proven at trial, arising out of City's negligent breach of its aforementioned duties owed to Mr. Nelson.

655.   As a result of Defendant City's aforementioned conduct against Nelson, Mr. Nelson has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

656.   Aa a direct result of Defendant City's unauthorized and illegal conduct here shown, Mr. Nelson was caused to suffer shame, humiliation, pain and suffering, loss of career, loss of financial benefits, loss of future salary, loss of opportunity for career advancement as a correction officer, and financial damages due to the loss of pay and benefits associated with the Civil Service position of correction officer.

657.   There has been no previous application for the relief sought herein.

658.   Mr. Nelson avers that he is therefore, entitled to relief in this Court.

## DEMAND FOR TRIAL BY JURY

659.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Nelson demands a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and that this Court:

a) Enter judgment reinstating Mr. Nelson to his permanent position as a correction officer; and,

b) Enter judgment directing Defendant City cease and desist its policy, practice, and custom of violating Civil Service Law § 75 in disciplinary and removal actions taken against

Mr. Nelson, and from violating the procedural due process clause of the Fourteenth Amendment to the Federal Constitution against Mr. Nelson; and,

c) Enter judgment directing Defendant City cease and desist its policy, practice, and custom of fraudulently changing the employment status of its permanent Civil Service employees from permanent to probationary in violation of Local Rules and state Civil Service Law and Rules promulgated for that purpose; and,

d) Enter judgment nullifying the null and void May 31, 2022 NPA; and,

e) Enter a permanent injunction to prevent future violations of New York State Civil Service Law § 75 by the Defendants; and,

f) Award Mr. Nelson backpay and benefits; and,

g) Award Mr. Nelson compensatory damages in the amount of seven hundred thousand dollars ($700,000.00) for pain and suffering, lost wages, and lost of future salary; and

h) Award Mr. Nelson exemplary damages against Defendant City in the amount of thirty million dollars ($30,000.000); and,

i) Award Mr. Nelson exemplary damages against Defendant Molina in the amount of one hundred thousand dollars ($100,000); and,

j) Award Mr. Nelson exemplary damages against Defendant Rehman in the amount of one hundred thousand dollars ($100.000); and,

k) Award Mr. Nelson exemplary damages against Defendant Thomson in the amount of one hundred thousand dollars ($100.000); and,

l) Award Mr. Nelson exemplary damages against Defendant Rembert in the amount of one hundred thousand dollars ($100.000); and,

m) Award Mr. Nelson exemplary damages against Defendant Carter in the amount of one hundred thousand dollars ($100.000); and,

n) Award Mr. Nelson exemplary damages against Defendant Troxler in the amount of one hundred thousand dollars ($100.000); and,

o) Award Mr. Nelson exemplary damages against Defendant Maldonado in the amount of one hundred thousand dollars ($100.000); and,

p) Award Mr. Nelson exemplary damages against Defendant Jackson law firm in the amount of five million dollars ($5,000.000); and,

q) Award Mr. Nelson exemplary damages against Defendant Boscio in the amount of one hundred thousand dollars ($100.000); and,

r) Award Mr. Nelson exemplary damages against Defendant K & M law firm in the amount of five million dollars ($5,000.000); and,

s) Award Mr. Nelson exemplary damages against Defendant COBA in the amount of five million dollars ($5,000.000); and,

t) Award Mr. Nelson exemplary damages against Defendant Jackson in the amount of one hundred thousand dollars ($100.000); and,

u) Award such relief against the Defendants as the Court finds necessary to redress injury to Mr. Nelson resulting from violations of law described above; and,

v) Award Mr. Nelson the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: May 24, 2024
       Brooklyn, New York

Respectfully submitted,

Troix Nelson
1060 Sterling Place
Brooklyn, NY 11213
(347) 362-8357
E-Mail: Tnelson18@live.com

TO:   **DEFENDANT CITY OF NEW YORK**
     Sylvia O. Hinds-Radix
     Corporation Counsel
      City of New York
     100 Church Street -4th FLOOR
     New York, New York 10007-2601
     (212) 356-1000

     **DEFENDANT KATHLEEN S. THOMSON**
     Acting Deputy Commissioner
     New York City Department of Correction
     Bulova Corporate Center
     75-20 Astoria Blvd
     East Elmhurst, NY 11370

     **DEFENDANT SHERRIE REMBERT**
     Assistant Chief of Administration
     New York City Department of Correction
     Bulova Corporate Center
     75-20 Astoria Blvd
     East Elmhurst, NY 11370

**DEFENDANT LOUIS A. MOLINA**
Commissioner of Correction
New York City Department of Correction
Bulova Corporate Center
75-20 Astoria Blvd
East Elmhurst, NY 11370

**DEFENDANT CHARISMA CARTER**
Warden
New York City Department of Correction
Bulova Corporate Center
75-20 Astoria Blvd
East Elmhurst, NY 11370

**DEFENDANT ASIM REHMAN**
Commissioner and Chief Administrative Law Judge
328 Sterling Place Apt. 4B
Brooklyn, NY 11238

**DEFENDANT PETER TROXLER**
Union Attorney
5 Penn Plaza, 23rd Floor
New York, NY 10001

**DEFENDANT MERCEDES MALDONADO**
Union Attorney
233 Broadway, Suite 2340
The Woolworth Building
New York, NY 10279

**DEFENDANT JOEY JACKSON**
Union Attorney
5 Penn Plaza, 23rd Floor
New York, NY 10001

**DEFENDANT JOEY JACKSON LAW PLLC**
Union Law Firm
5 Penn Plaza, 23rd Floor
New York, NY 10001

**DEFENDANT KARASYK & MOSCHELLA, LLP**
Union Law Firm
233 Broadway, Suite 2340
The Woolworth Building
New York, NY 10279

**DEFENDANT BENNY BOSCIO**
Correction Officers' Benevolent Association, Inc.
77-10 21st Avenue
East Elmhurst, NY 11370

**DEFENDANT CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.**
Correction Officers' Benevolent Association, Inc.
77-10 21st Avenue
East Elmhurst, NY 11370

A NEGOTIATED PLEA AGREEMENT FOR SETTLEMENT OF DISCIPLINARY MATTERS WITHIN
**THE DEPARTMENT OF CORRECTION**

Prior to the commencement of plea negotiations, it is acknowledged as hereinafter subscribed by the Respondent, Respondent's Attorney and the Department's Trial Division, that any subsequent agreement concerning a stipulated penalty which may be accepted by the Trial Division will constitute the Trial Division's recommendation to the Commissioner of Correction.

In the event that plea negotiations do not result in an agreement, no statements by the Respondent or his Attorney in connection and relevant thereto, will be admissible against the Respondent. The Respondent's rights and privileges, including the right to an Administrative Hearing will remain unaffected, and the Department's Disciplinary process will proceed as if plea negotiations had never taken place.

Respondent further warrants that any supporting documents or affidavits submitted by Respondent in connection with or for the purpose of inducing the Department to accept this negotiated plea, are truthful. In the event said documents are proven to be inaccurate or false, you will be subjected to additional charges and the plea agreement will become null and void.

Date: _5/31/22_____         _____TN_____    _13152_____
                                    Troix Nelson (May 31, 2022 16:34 EDT)     Signature, I.D./Shield #

_Peter Troxler_____        _____
Attorney for Respondent                Attorney/Trial Division

------------------------------------------------------------------------------------------------------

In the matter of the FORMAL CONFERENCE held for **C.O. Troix Nelson** of the Department of Correction, holding the position of **Correction Officer**, Shield #**13152**, Institution: **AMKC**.

I, **C.O. Troix Nelson**, acknowledge receipt of a copy of the charges and specifications dated **April 12, 2022**, DR #(s) **1614/2021**, and annexed hereto.

I am fully aware of the fact that I am entitled to a disciplinary Hearing pursuant to section 75 of the Civil Service Law in which I would be entitled to representation, to confront witnesses against me and to present witnesses on my behalf. I am also aware that I may elect to appeal an adverse decision rendered after such hearing to either the Supreme Court of the State of New York or the Civil Service Commissioner in accordance with procedures set forth in Section 76 of the Civil Service Law.

I have been advised that the penalty recommended for the charges and specifications sustained against me is as follows:

the officer agrees to forfeit thirty (30) compensation days; and to two (2) years limited probation, limited to violations of time and

leave rules, regulations, directives, and laws. Should the officer not have sufficient compensation leave balances, the remainder shall

be deducted from annual leave balances.


Upon the APPROVAL of the terms of this settlement by the NYC Dept. of Correction Commissioner, the effective date of the

probation (IF ANY) shall then be deemed to have commenced retroactively as of the date of execution of this agreement (on the date

signed by the Trials Division Attorney). I further acknowledge that any violation of the terms of probation which may occur following

the date of execution of this agreement but prior to the final approval by the Commissioner may be considered by the Department as a

violation of the terms of probation, notwithstanding the fact that I may also have been subject to other disciplinary measures on the

basis of the same events.

If this penalty is approved by the Commissioner of Correction, I accept said decision, and as a condition of accepting such decision of the Commissioner of Correction, I hereby waive any and all rights granted to me under section 75 and 76 of the Civil Service Law and acknowledge that this acceptance is the same as a finding of guilt after a hearing.

I am fully aware that if the Commissioner of Correction approves the penalty, this waiver of my right to a section 75 hearing is final and irrevocable and that this waiver will be placed in my permanent personnel file, as a disposition of the Disciplinary Charges and specifications. Further, I fully understand that the Commissioner may reduce the penalty at his or her own discretion and I hereby consent to such reduction.

I acknowledge the Commissioner at his or her discretion may reduce said penalty, without respondent's reappearance.

This agreement includes a period of probation, (Attached Form # ___TN___ Troix Nelson (May 31, 2022 16:34 EDT) initials.

_____ Action by Commissioner of Corrections _____ Approved.

Penalty reduced as follows:

_____

_____

___TN_____              _13152_____
Troix Nelson (May 31, 2022 16:34 EDT)     I.D./Shield No.
Signature
5/31/22
_____
Dated

_Peter Troxler_____        _____
Attorney for Respondent                Attorney/Trial Division

------------------------------------------------------------------------------------------------------

I hereby approve the penalty recommended herein.


_____        _____
Cynthia Lindblom                            Louis A. Molina
Acting Deputy Commissioner              Commissioner of Correction

**Exhibit 1**

## PROBATION AGREEMENT FORM

Name of Respondent (print): **CO Troix Nelson, #13152**

DR's No.: **1614/2021**

I,    **C.O. Troix Nelson**                    `**13152**
      (Name of Respondent)        (Shield No)

fully understand that by accepting the negotiated plea of:

(1) _____ Full probation for a period of _____

(2) ____**X**____ Limited probation for a period of **two (2) years**, limited to **violations of time and leave rules, regulations, directives, and laws.**

_____

_____

I understand that this period of probation shall be extended by the number of days I do not perform the full duties of my position because of sick leave, annual leave, jury duty, death in family, leave without pay, compensatory time, suspension time, absence without leave, modified duty or medically monitored duty. This probationary period will begin on the effective day indicated below.

I further understand that this agreement to accept  probation will not become effective until such time as the Negotiated Plea Agreement is accepted by the agency as evidenced by the signature of the Commissioner of the New York City Department of Correction or Designee - (_____), at which time the period of probation shall be deemed to have commenced retroactively as of the date of execution of this agreement (on the date signed by the Trials Division Attorney), as set forth below. I further acknowledge that any violation of the terms of probation which may occur following the date of execution of this agreement but prior to final approval by the Commissioner may be considered by the Department as a violation of the terms of probation, notwithstanding the fact that I may also have been subject to other disciplinary measures on the basis of the same events.

I have indicated below the address to which a copy of the accepted agreement shall be mailed as proof of service.

I have waived my rights as a tenured employee for this probationary period and subject myself to termination as any other probationary employee.

Any misconduct committed prior to the date of acceptance of this negotiated plea shall not affect my probation.

Date: May 31, 2022                    _____    13152
                                      Troix Nelson (May 31, 2022 15:34 EDT)
                                      Respondent's Signature, Title & Shield

_____              *Peter Troxler*
Department Attorney                  Attorney for Respondent

Respondent's Address: **1060 sterling place**
1060 sterling place

_____

_____              _____    **Exhibit 1-1**
Commissioner of Correction or Designee    Date of Acceptance

_____    _____    _____
Date of Service            Effective Date             Respondent's Signature, Title & Shield

# Troix Nelson NPA (1614-21)- 30 & 2 years

Final Audit Report                                           2022-05-31

| | |
|---|---|
| Created: | 2022-05-31 |
| By: | Ariana Militello (Ariana.Militello@joeyjacksonlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtmJlpOgvLUrjbrPxvJsdyMzinkIdF5n3 |

## "Troix Nelson NPA (1614-21)- 30 & 2 years" History

Document created by Ariana Militello (Ariana.Militello@joeyjacksonlaw.com)
2022-05-31 - 6:42:00 PM GMT

Document emailed to Troix Nelson (tnelson ▨▨▨▨ for signature
2022-05-31 - 6:43:18 PM GMT

Email viewed by Troix Nelson (tnelson ▨▨▨▨
2022-05-31 - 6:55:58 PM GMT

Document e-signed by Troix Nelson (tnelson ▨▨▨▨
Signature Date: 2022-05-31 - 7:34:44 PM GMT - Time Source: server

Agreement completed.
2022-05-31 - 7:34:44 PM GMT

**Exhibit 1-2**

**Adobe Acrobat Sign**



**From: troix nelson** tnelson18@live.com
**Subject:** Fwd: You signed: "Troix Nelson NPA (1614-21)- 30 & 2 years"
**Date:** November 10, 2023 at 10:40
**To:** Wayne Tatum nyce.da.ecs.llc@gmail.com

Sent from my iPhone

Begin forwarded message:

**From:** Joey Jackson Law <adobesign@adobesign.com>
**Date:** May 31, 2022 at 3:34:50 PM EDT
**Subject: You signed: "Troix Nelson NPA (1614-21)- 30 & 2 years"**
**Reply-To:** Ariana Militello <Ariana.Militello@joeyjacksonlaw.com>



 **Adobe Acrobat Sign**



## You're done signing
## Troix Nelson NPA (1614-21)- 30 & 2 years



Attached is the final agreement for your reference. You can also
open it online to review its activity history.

Powered by
**Adobe Acrobat Sign**                                 **Exhibit 1-3**

Need your own documents signed? Adobe Acrobat Sign can help save you time. **Learn more**.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your
address book or safe list.

Terms of Use | Report Abuse

**THE CITY OF NEW YORK DEPARTMENT OF CORRECTION**
**A NEGOTIATED PLEA AGREEMENT FOR SETTLEMENT OF DISCIPLINARY MATTERS WITHIN**
**THE DEPARTMENT OF CORRECTION**

Prior to the commencement of plea negotiations, it is acknowledged as hereinafter subscribed by the Respondent, Respondent's Attorney and the Department's Trial Division, that any subsequent agreement concerning a stipulated penalty which may be accepted by the Trial Division will constitute the Trial Division's recommendation to the Commissioner of Correction.

In the event that plea negotiations do not result in an agreement, no statements by the Respondent or his Attorney in connection and relevant thereto, will be admissible against the Respondent. The Respondent's rights and privileges, including the right to an Administrative Hearing will remain unaffected, and the Department's Disciplinary process will proceed as if plea negotiations had never taken place.

Respondent further warrants that any supporting documents or affidavits submitted by Respondent in connection with or for the purpose of inducing the Department to accept this negotiated plea, are truthful. In the event said documents are proven to be inaccurate or false, you will be subjected to additional charges and the plea agreement will become null and void.

Date: _3/24/23_        _Troix Nelson_    _C.O., Sh 13152_
                                            Signature, I.D./Shield #

_____        _____
Attorney for Respondent                  Attorney/Trial Division

--------------------------------------------------------------------------------

In the matter of the FORMAL CONFERENCE held for Troix Nelson of the Department of Correction, holding the position of Correction Officer, Shield # 13152. Institution: Anna M. Kross Center (AMKC).

I, Troix Nelson, acknowledge receipt of a copy of the charges and specifications dated 02/08/2023 DR# B2266/2022, and annexed thereto.

I am fully aware of the fact that I am entitled to a disciplinary Hearing pursuant to section 75 of the Civil Service Law in which I would be entitled to representation, to confront witnesses against me and to present witnesses on my behalf. I am also aware that I may elect to appeal an adverse decision rendered after such hearing to either the Supreme Court of the State of New York or the Civil Service Commissioner in accordance with procedures set forth in Section 76 of the Civil Service Law.

I have been advised that the penalty recommended for the charges and specifications sustained against me is as follows:

Said Respondent agrees to serve a period of ten (10) days suspension with credit for time served on suspension from on or about

November 22, 2022 to on or about December 2, 2022.

_____
_____
_____

If this penalty is approved by the Commissioner of Correction, I accept said decision, and as a condition of accepting such decision of the Commissioner of Correction, I hereby waive any and all rights granted to me under section 75 and 76 of the Civil Service Law and acknowledge that this acceptance is the same as a finding of guilt after a hearing.

I am fully aware that if the Commissioner of Correction approves the penalty, this waiver of my right to a section 75 hearing is final and irrevocable and that this waiver will be placed in my permanent personnel file, as a disposition of the Disciplinary Charges and specifications. Further, I fully understand that the Commissioner may reduce the penalty at his or her own discretion and I hereby consent to such reduction.

I acknowledge the Commissioner at his or her discretion may reduce said penalty, without respondent's reappearance.

This agreement includes a period of probation, (Attached Form #_____) _____initials.   _N/A; No Probation_

_____ Action by Commissioner of Corrections _____ Approved.

Penalty reduced as follows:

_____
_____

_Troix Nelson_        _C.O., Sh 13152_
Signature                  I.D./Shield No.
_3/24/23_

_____        _____
Attorney for Respondent                  Attorney/Trial Division

--------------------------------------------------------------------------------

I hereby approve the penalty recommended herein.

_____        _____
Solange Grey                              Louis A. Molina
Deputy Commissioner                    Commissioner of Correction

**Exhibit 2**

**✖ Dropbox** Sign

Audit trail

| | |
|---|---|
| Title | Troix Nelson NPA.pdf |
| File name | Troix%20Nelson%20NPA.pdf |
| Document ID | 3978aff37b28d871bca968d414f9a570accb5da0 |
| Audit trail date format | MM / DD / YYYY |
| Status | ☀ Signed |

**This document was requested from app.clio.com**

Document History

| ⟳ SENT | **03 / 24 / 2023** 16:02:46 UTC | Sent for signature to Troix Nelson (tnelson██████) from peter.troxler@joeyjacksonlaw.com IP: 174.197.135.0 |
|---|---|---|
| ◉ VIEWED | **03 / 24 / 2023** 16:03:51 UTC | Viewed by Troix Nelson (tnelson██████) IP: 148.75.243.14 |
| ✓ SIGNED | **03 / 24 / 2023** 16:04:51 UTC | Signed by Troix Nelson (tnelson██████) IP: 148.75.243.14 |
| ⊘ COMPLETED | **03 / 24 / 2023** 16:04:51 UTC | The document has been completed. |

**Exhibit 2-1**

Powered by ✖ Dropbox Sign



NEW YORK CITY DEPARTMENT OF CORRECTION
Louis A. Molina, Commissioner

Kat Thomson, (Acting) Deputy Commissioner/Chief of Staff
Human Resources
75-20 Astoria Boulevard, Suite 320
East Elmhurst, New York. 11370
Tel 718 • 546 • 3100

**To:**      Troix Nelson
            Probationary Correction Officer

**From:**   Kat Thomson
            Acting Deputy Commissioner/Chief of Staff

**Date:**    July 25, 2023

**Subject:**  Termination – Employee I.D. # 1557683

---

Your service as a Probationary Correction Officer will no longer be required effective,
Wednesday, July 26, 2023.

Please be reminded that you must surrender to the individual serving this letter upon you,
your identification card, rules & regulations book, as well as any other items issued to you
before we can release your last paycheck.

We greatly appreciate your contribution to the Department of Correction and to the City of
New York.

Thank you.

Troix Nelson: _REFUSED_

Date: _2/31/23_

Witnessed by: _____

Date: _07/31/23_

# Exhibit 3

KT:ew



**NEW YORK CITY DEPARTMENT OF CORRECTION**
Louis A. Molina, Commissioner

**Sonya Harvey, Assistant Commissioner**
Eric M Taylor Center
10-10 Hazen Street
East Elmhurst, NY 11370

718 • 546 •5700
Fax 718 • 546 •6548

**DATE:**   July 31, 2023

**TO:**   Charlton Lemon, Chief of Security

**FROM:**   Sonya Harvey, Assistant Commissioner, Eric M Taylor Center

**SUBJECT: RIKERS ISLAND EXIT LETTER - EMTC**

Please permit former Correction Officer Troix Nelson #13152 exit Rikers Island on this date only. MOS is not in possession of departmental identification card or shield and has been terminated from the department.

Please feel free to contact the Administration at (718) 546-5700 or the Tour Commander (718) 546-5881.

Sonya Harvey, Assistant Commissioner

*Visit NEW YORKS BOLDEST on the Web at: www.nyc.gov/boldest*

**Exhibit 4**

**NEW YORK CITY DEPARTMENT OF CORRECTION**
**PERSONNEL DIVISION**

## DEPARTMENTAL PROPERTY RECEIPT FORM

| FORM # 887 | REV. 03/13 | REFERENCE: GEN. ORDER #01/13 |
|---|---|---|

**SECTION #1 - TO BE COMPLETED BY MEMBER'S COMMAND**

| RECEIVED FROM (EMPLOYEE'S NAME) | Troix, Nelson |
|---|---|

| RANK / TITLE | | COMMAND | EMTC |
|---|---|---|---|

| REASON (CHECK ONE) | ☐ RETIREMENT    ☐ RESIGNATION    ☐ SUSPENSION |
|---|---|
| | ☑ TERMINATION    ☐ OTHER (SPECIFY) _____ |

| FIREARMS INFORMATION | SERIAL NUMBER | N/A | PISTOL PERMIT (CHECK ONE) |
|---|---|---|---|
| ☐ CHECK IF APPLICABLE | MAKE | | ☐ YES    ☐ NO |
| | MODEL NUMBER | | |

| RECEIVED BY (PRINT NAME) | N/A | RANK / TITLE | |
|---|---|---|---|
| SIGNATURE | N/A | DATE | / / |

**SECTION #2 - TO BE COMPLETED BY THE APPLICANT INVESTIGATION UNIT**

| ITEMS (CHECK) | | | |
|---|---|---|---|
| 1. SHIELD | ☑ | SHIELD #: | 13152 |
| 2. HAT PIECE | ☐ | HAT PIECE #: | |
| 3. RULES & REGULATIONS | ☐ | RULES AND REGULATIONS #: | |
| 4. IDENTIFICATION CARD | ☑ | CONTROL #: | 53996 |
| 5. STAB/SLASH AND BALLISTIC VEST | ☐ | STAB/SLASH AND BALLISTIC VEST #: | |
| 6. PARKING PERMIT/PASS | ☐ | PARKING PERMIT/PASS #: [Specify type(s)] | |

| PROPERTY IN SECTION #2 RECEIVED BY | PRINT NAME | REYES #18654 | |
|---|---|---|---|
| | SIGNATURE | | |
| | RANK / TITLE | C-O | DATE | 7/31/2023 |

| IDENTIFICATION CARD RETURNED TO MEMBER (CHECK ONE) | ☐ YES    ☐ NO |
|---|---|
| SIGNATURE OF MEMBER CONCERNED | n/a |

**SECTION #3 - DISTRIBUTION**

| ORIGINAL TO BE FILED AT MEMBER'S COMMAND | COPY TO PERSONNEL DIVISION |
|---|---|
| COPY TO APPLICANT INVESTIGATION UNIT (A.I.U.) | COPY TO MEMBER |

**Exhibit 4-1**

 Gmail

Wayne Tatum <nyce.da.ecs.llc@gmail.com>

## Troix Nelson probationary termination

Wayne Tatum <nyce.da.ecs.llc@gmail.com>
To: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Wed, Nov 15, 2023 at 9:51 PM

**From:** "Mercedes M. Maldonado" <mmaldonado@kmattorneys.com>
**Date:** September 6, 2023 at 4:33:51 PM EDT
**Subject: Troix Nelson probationary termination**

Hi Troix:

After that long discussion with your mother, it is abundantly clear that you wish to challenge your termination.   For the reasons we discussed on the phone, I think an Article 78 proceeding is not likely to result in your reinstatement.  That said, I am willing to try, if you send me the information requested below.

Apart from DOC's claim of 14 denied PE requests and 17 sick occasions, I need to be able to mount a defense to DOC's claim that you were late on 24 days during your limited probation.   Your explanation is that you were entitled to 10 hours between tours and that you were entitled to report to work after your shift starting to give yourself 10 hours' time between tours.   For each of the late days that DOC listed, please put together a list that specifies <u>the date and time</u> that your overtime shift ended, <u>the date and time</u> that your next shift was scheduled to begin, and the time you showed up for that shift. (equal to 10 hours from when you were relieved on OT).

If any of the latenesses were due to your grandmother, did you request a PE??  If so, please identify any lateness's due to your grandmother along with the PE paperwork you submitted.  If none of the late days related to your grandmother, let me know that as well.

As discussed, please forward all documentation relating to your Chronic Absence Designation and Appeal.

**The deadline to file an Article 78 proceeding expires on 11/25/2023.**
If you wish to use my services, which are provided through COBA, please let me know by reply email no later than September 29, 2023.  My office will then reach out to you about the filing fee.

**Exhibit 5**

if, however, you decide to hire an attorney of your choosing, you should
let me know (and keep in mind the 11/25/23 deadline.)


Mercedes Maldonado, Esq.
Karasyk & Moschella, LLP
233 Broadway, Suite 2340
New York, NY 10279
Direct: (646)974-5243
Main: (212)233-3800
mmaldonado@kmattorneys.com

**Confidentiality Note**

**This e-mail, and any attachment to it, contains legally privileged
and confidential information intended only for the use of
individual(s) or entity named on the e-mail. If the reader of this e-
mail is not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are
hereby notified that any disclosure, copying, distribution or use of
the contents of this information is strictly prohibited. If you have
received this e-mail in error, please immediately return it to the
sender, notify sender immediately and delete it from your system.
Thank you.**

**Exhibit 5-1**



Kat Thomson, **Chief of Staff, Acting Deputy Commissioner**
Ayinde Williams, **Assistant Commissioner**
Human Resources
75-20 Astoria Boulevard, Suite 320
East Elmhurst, New York. 11370
718 • 546 • 3100
Fax 718 • 278 • 6084

October 2, 2023

Troix Nelson
1060 Sterling Place
Brooklyn, NY 11213

Dear Troix Nelson,

After a review of your records regarding your request for reinstatement, the Department has decided to not move forward with your reinstatement to your former position of Correction Officer.

We thank you for your service and wish you all the best in your future endeavors.

Sincerely,

Kat Thomson
Chief of Staff, Acting Deputy Commissioner of Human Resources

**Exhibit 6**

# Troix Nelson

1060 Sterling Place
Brooklyn, NY 11213
347-362-8357
tnelson ▓▓▓▓

October 27, 2023

Correction Officers' Benevolent Association, Inc.
77-10 21st Avenue
East Elmhurst, NY 11370

Dear Executive Board:

On July 31, 2023, I was dismissed from service as a correction officer and given a letter to exit Rikers Island.

Attorney Mercedes Maldonado of Karasyk & Moschella LLP, obtained my disciplinary records from DOC through a FOIL request.

In the documents that were provided to her from that request, one of the reasons stated by the Acting Warden who requested that my employment be terminated was that my sick leave use was excessive.

The COBA CBA at Article X, Section 1, provides that I was entitled to "leave ... for the full period of any incapacity," as further enunciated therein.

Therefore, my dismissal from service was in violation of the provisions set forth in COBA's Collective Bargaining Agreement, and I am requesting that COBA process a grievance (Attached) on my behalf. Additionally, I am requesting that COBA (i) investigate and determine whether my employment was terminated in violation of any City Rules or, of any provisions of the Civil Service Law and Rules, (ii) demand that DOC reinstate me immediately, (iii) notify me of COBA's findings in my particular case situation and on my requests for COBA's assistance made herein, and (iv) demand of DOC that the NPA in this case be made null and void.

Sincerely yours,

Troix Nelson
Former Correction Officer #13152

**Exhibit 7**




**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.**
*"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"*

*Phone 212-274-8000/ Fax 212-349-6801*
## GRIEVANCE FORM

| *Please Refer To The C.O.B.A. Contract, Rules & Regulations, Directives & Operation Orders To Determine If Your Complaint Is In Fact Grievable* |
|---|

| *Date* October 27, 2023 | *Command* EMTC | *Submitted To Head of Facility:* |
|---|---|---|

| *Grievant's Name* Troix Nelson | *Shield #* 13152 | *Grievant's Signature* |
|---|---|---|

| *For Office Use Only Grievance Number:* | *Cite Contract, Rules and Regulations, Directives & Operation Orders Violated:* COBA CBA, Artcle X, Section 1 |
|---|---|

| *Submitted By Check One:   Self ☐   Delegate ☐   Union ☐* | *Witnesses* |
|---|---|

*Statement of Facts, include date(s) of occurrence (Use additional sheets if necessary.)*

On July 31, 2023, I was dismissed from service by Kat Thomson. And in the FOIL papers that were provided to COBA attorney M. Maldonado, excessive sick leave use, amongst other allegations of wrongdoing, was cited against me as the reasons for requesting my termination.

DOC has violated the provisions in the COBA Collective Bargaining Agreement, Article X Section 1, by citing "excessive" sick leave use as a reason for terminating my employment. When in fact, the COBA CBA provided me with unlimited sick leave use at the time when I used the sick leave provisions in the CBA; as shown in my last 22R and the FOIL papers provided to attorney M. Maldonado.

*Remedy Being Sought: (Use Additional Sheets If Necessary)*

The remedy that I am seeking is first, to be reinstated promptly; second, for DOC to nullify the NPA that is the subject of this issue as shown in the FOIL papers that attorney Maldonado has in her possession; and thirdly, I am seeking back pay from July 31, 2023 to the date of my reinstatement.

*In accordance with the Collective Bargaining Agreement Article XXI Section 2, "The Head of the facility shall take any steps necessary to a proper disposition of the grievance and shall reply in writing by the end of the third work day following the date of submission. Section 7, cites " The City shall notify the Union in writing of all grievances filed by employees, all grievance hearings, and all determinations. The Union shall have the right to have a representative present at any grievance hearing and shall be given forty-eight (48) hours notice of all grievance hearings.*

*Warden's Response: (Use Additional Sheets If Necessary)*

# Exhibit 7-1

| *Date of Warden's Response:* | *Warden's Signature:* |
|---|---|
| *For Office Use Only:* | *Received By:* | *Date:* |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Nov 06, 2023

**RETURN TO**

Troix Nelson
1060 Sterling Pl
Brooklyn, NY 11213

**SHIP TO**

Benny Boscio & COBA
7710 21st Ave
East Elmhurst, NY 11370

**REFERENCE**

| | |
|---|---|
| Ship Date: | Oct 27, 2023 |
| Ship from ZIP: | 11213 |
| Weight: | 0lbs. 1oz. |
| User: | XXXXXXXX |
| Cost Code: | |
| Refund Type: | Mail-in |
| Reference #: | |
| Printed on: | Envelope |
| Delivery Status: | Printed |
| Tracking #: | 0004089956059575510511370129 |

| SERVICE | UNIT PRICE |
|---|---|
| USPS First-Class Mail® Letter | $0.63 |
| Insurance (Carrier Insurance ($0.00)) | $0.00 |
| Certified Mail | $4.35 |
| Return Receipt | $3.55 |
| Subtotal | $8.53 |
| Label Quantity | 1 |
| Total Cost | $8.53 |

**Exhibit 7-2**





**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| Certified Mail Fee | 4.35 |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☑ Return Receipt (hardcopy) | $ 3.55 |
| ☐ Return Receipt (electronic) | $ |
| ☐ Certified Mail Restricted Delivery | $ |
| ☐ Adult Signature Required | $ |
| ☐ Adult Signature Restricted Delivery | $ |
| Postage | .63 |
| Total Postage and Fees | 8.53 |

Postmark
Here

Sent To  Benny Boscio + COBA
Street and Apt. No., or PO Box No.  77-10 21st Ave
City, State, ZIP+4®  E. Elmhurst NY 11370

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

1219

7019 2970 0000 9664 0693

Troix Nelson
1060 Sterling Pl
Brooklyn NY 11213-2501

$8.530
US POSTAGE
FIRST-CLASS
FROM 11213
10/27/2023
stamps.
endicia

062S0000429811

**Exhibit 7-3**



7019 2970 0000 9664 0693

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$ 4.35

Extra Services & Fees (check box, add fee as appropriate)
☑ Return Receipt (hardcopy)         $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postage
$ .63

Total Postage and Fees
$ 8.53

Sent To  Benny Boscio + COBA

Street and Apt. No., or PO Box No.
7710 21st Ave

City, State, ZIP+4®
E. Elmhurst NY 11370

Postmark Here

OCT 27 2023

JAMAICA
MAIN POST OFFICE

Exhibit 7-4

USPS.COM®

| Quick Tools | Send | Receive | Shop | Business | International | Help |

⊕ English   ⊙ Locations   ⟳ Support   ⚲ Informed Delivery   Register / Sign In   ⌂

ALERT: ON NOVEMBER 3, 2023, THE TRACKING APPLICATION WILL BE UNAVAILABLE FOR A PERIOD DURING ROUTINE MAINTENANCE. WE APOLOGIZE FOR ANY INCONVENIENCE.

# USPS Tracking®

Tracking    FAQs

⚒ **Track Packages**
**Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

Learn More

Tracking Number:

**70192970000096640693**

⧉ Copy    ⚲ Add to Informed Delivery

Remove

ⓥ **Delivered**
**Delivered, Front Desk/Reception/Mail Room**
EAST ELMHURST, NY 11370
November 2, 2023, 12:56 pm

See All Tracking History

## Latest Update

Your item was delivered to the front desk, reception area, or mail room at 12:56 pm on November 2, 2023 in EAST ELMHURST, NY 11370.

What Do USPS Tracking Statuses Mean?

**Exhibit 7-5**



NEW YORK CITY DEPARTMENT OF CORRECTION
Louis Molina, Commissioner

Charisma Carter, Acting Warden
Anna M. Kross Center
18-18 Hazen Street
East Elmhurst, NY 11370
718 • 546 • 3500
Fax 718 • 546 • 3503

**DATE:**  June 26, 2023

**TO:**  Kat Thomson, Chief of Staff

**FROM:**  Charisma Carter, Acting Warden, Anna M. Kross Center

**SUBJECT:  PERSONNEL DETERMINATION REVIEW OFFICER TROIX NELSON# 13152**

In accordance with Teletype Order #HQ-02422-0, entitled, "Personnel Determination Review", dated March 3, 2019, the following probationary employee is being submitted for consideration:

> ➢ Correction Officer Troix Nelson #13152 /Ref # ▨▨▨

This request is based on the following:

On June 26, 2023, a review of excessive personal emergencies was conducted, and it was revealed that Officer Troix Nelson #13152 has taken approximately fourteen (14) personal emergencies. The dates of personal emergency taken are listed below:

> ➢ March 15, 2023 – denied
> ➢ March 16, 2023 – denied
> ➢ April 27, 2023 – denied
> ➢ May 06, 2023 – denied
> ➢ May 07, 2023 – denied
> ➢ May 08, 2023 – denied
> ➢ May 12, 2023 – denied
> ➢ May 13, 2023 – denied
> ➢ May 21, 2023 – denied
> ➢ May 24,2023 – denied
> ➢ June 02, 2023 – denied
> ➢ June 11, 2023 – denied
> ➢ June 12, 2023 – denied
> ➢ June 20, 2023 – denied

*DOA 6/27/2016*
*ERN # ▨▨▨*
*Shield# 13152*
*NPA: 05/31/22*

A review of Officer Nelson's Employees performance service report 22R, revealed two (2) memorandum of complaints and one (1) command disciplines as below.

**MEMORANDUM OF COMPLAINT**
> ➢ MOC # 1619/22 AWOL – (30) COMP/VAC DAYS +2 YRS LTD PROBATION
> ➢ MOC# 2266/22 UOF INEFF PERF – (10) SUSP DAYS W/C/T/S

**Exhibit 8**

## COMMAND DISCIPLINE
  ➢ CD # 372/23 R&R # 3.00.120, 3.05.010 & 3.05.050

Officer Nelson has 2 guilty memorandums of complaints since appointed to the department resulting in MOS receiving 2 years limited probation. Additionally, Officer Nelson was placed in chronic status on January 01, 2023, due to excessive sick leave and extended to September 05.2023 due to continuous sick leave.

As a result of officer Nelson repeated violation of the departmental Rules and Regulations the command is recommending termination.

Note: the following documentation is attached for your review.
  ➢ Employee Performance Service Record (22R)
  ➢ Teletype #HQ-02436-0
  ➢ Leave Request Report

If additional information is required, please advise.

TB/dr
AMKC#EMAIL

C: Charisma Carter, Acting Warden, AMKC
Tatanisha Banks, Deputy Warden

Attachments

**Exhibit 8-1**

ITEM NO: PDRUT01

### NEW YORK CITY DEPARTMENT OF CORRECTION
### PERSONNEL DETERMINATION REVIEW

| EMPLOYEE NAME: | Troix Nelson | | SUBMITTED BY: | Charisma Carter |
|---|---|---|---|---|
| | | | | WARDEN |
| APPT. DATE: | 06/27/16 | | FACILITY/DIVISION: | A.M.K.C. |
| NPA DATE: | 05/31/22 | NPA PROB ENDS* 08/04/24 | RECOMMENDATION: | TERMINATION |
| | *Entered into a 2 year NPA agreement on 05/31/22 | | | |
| SHIELD/ID NO: | 13152 | | FACILITY/DIVISION: | A.M.K.C. |
| C.S. STATUS: | Probationary Correction Officer | | | |

**REQUEST/RECOMMENDATION:**                                  Termination

**REASON FOR REFERRAL:** Anna M Kross Center (AMKC) is requesting termination for Correction Officer Troix Nelson #13152 for violation of a negotiated plea agreement (NPA). On May 31, 2022 C.O. Nelson entered into a NPA with the Department of Correction, under Settlement DR #1614/2022 stipulating C.O. Nelson serve a limited probation for a period of two years limited to time and leave violations. Since her NPA C.O. Nelson has been out on sick leave, LWOP, AWOL, and annual leave

MMR DATES

**PROBATIONARY/PERFORMANCE RATINGS:**                N/A

**ATTENDANCE RECORD: SINCE →** 05/31/22

| DATES | # OF DAYS | REASON |
|---|---|---|
| 06/05/22 | 1 | Trauma |
| 08/28/22 - 08/30/22 | 3 | Trauma |
| 09/03/22 | 1 | Dental |
| 09/03/22 | 1 | Dental |
| 10/30/22 | 1 | Dental |
| 11/08/22 | 1 | Dental |
| 11/08/22 | 1 | General Symptoms |
| 11/11/22 | 1 | Gastrointestinal |
| 11/21/22 | 1 | Gastrointestinal |

**17 Occasion(s) Sick =    23   days**

| DATES | # OF DAYS | REASON |
|---|---|---|
| 12/03/22 | 1 | Dental |
| 12/11/22 | 1 | Gastrointestinal |
| 12/17/22 | 1 | Dental |
| 12/26/22 | 1 | Gastrointestinal |
| 01/02/22 | 1 | Dental |
| 01/09/22 - 01/10/22 | 2 | Dental |
| 02/05/23 - 02/08/23 | 4 | Trauma |
| 03/04/23 | 1 | Gastrointestinal |

**PUNCTUALITY RECORD: SINCE →** 05/31/22

| DATES | HRS/MINS | REASON |
|---|---|---|
| 06/07/22 | 1:00 | Unknown |
| 06/11/22 | 1:31 | Unknown |
| 06/12/22 | 1:45 | Unknown |
| 06/14/22 | 1:45 | Unknown |
| 06/17/22 | 2:00 | Unknown |
| 06/24/22 | 2:00 | Unknown |
| 07/14/22 | 1:40 | Unknown |
| 07/31/22 | 1:30 | Unknown |
| 08/24/22 | 1:00 | Unknown |
| 09/11/22 | 2:59 | Unknown |
| 01/04/23 | 2:30 | Unknown |
| 01/13/23 | 2:00 | Unknown |

**'24 Occasion(s) Late =    3:00  hh:mm**

| DATES | HRS/MINS | REASON |
|---|---|---|
| 03/07/23 | 2:00 | Unknown |
| 03/12/23 | 2:00 | Unknown |
| 03/19/23 | 2:15 | Unknown |
| 03/25/23 | 3:00 | Unknown |
| 04/18/23 | 2:00 | Unknown |
| 04/21/23 | 1:00 | Unknown |
| 05/20/23 | 5:00 | Unknown |
| 05/25/23 | 2:20 | Unknown |
| 06/05/23 | 2:18 | Unknown |
| 06/17/23 | 2:30 | Unknown |
| 07/02/23 | 3:30 | Unknown |
| 07/08/23 | 4:30 | Unknown |

**DISCIPLINARY RECORD: SINCE →** 05/31/22

| DATES | ACTION | REASON |
|---|---|---|
| 02/24/23 | CO#372/23 | R&RH 3.05.120, 3.05.010, 3.05.050 |

**COMMENTS**
Loss of 4 Comp Days

**\*NOTE:** While on a NPA agreement C.O. Nelson has been out 68 days as follows: [Sick 68 days], LWOP [26 days], AWOL [2 days] and AL [17 days]

EID# 1557683

### ASSISTANT CHIEF'S FINAL DETERMINATION:

|  |  |  |  |  |
|---|---|---|---|---|
| | | | | EXTENSION OF PROBATION |
| TENURE: | SHERRIEANN REMBERT      DATE | | EXTENSION ONLY: | DAY FOR DAY |
| | ASSISTANT CHIEF | | | SHERRIEANN REMBERT      DATE |
| | | | | ASSISTANT CHIEF |
| NO ACTION: | SHERRIEANN REMBERT      DATE | | DAY FOR DAY + 3 MONTHS: | SHERRIEANN REMBERT      DATE |
| | ASSISTANT CHIEF | | | ASSISTANT CHIEF |
| | | | DAY FOR DAY + 6 MONTHS: | SHERRIEANN REMBERT      DATE |
| | | | | ASSISTANT CHIEF |
| DEFERRED DECISION: | SHERRIEANN REMBERT      DATE | | TERMINATION: | SHERRIEANN REMBERT      DATE   7-25-2023 |
| | ASSISTANT CHIEF | | | ASSISTANT CHIEF |

☐  DECISION AFFIRMED

☐  DECISION NOT AFFIRMED

LOUIS A. MOLINA      DATE
COMMISSIONER

**Exhibit 8-2**

415R



### THE CITY OF NEW YORK
### DEPARTMENT OF CORRECTION

# DIRECTIVE



| [ ] NEW          [ ] INTERIM          [x] REVISED | SUBJECT |
|---|---|
| | **COMMAND DISCIPLINE** |

| EFFECTIVE DATE 12/22/05 | *TERMINATION DATE / / | |
|---|---|---|

| CLASSIFICATION # 4257R-A | SUPERSEDES 4257 | DATED 05/05/88 | APPROVED FOR WEB POSTING [ ] YES [x] NO | DISTRIBUTION A | PAGE 1 OF 17 PAGES |
|---|---|---|---|---|---|

| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | AUTHORIZED BY THE COMMISSIONER |
|---|---|
| ROBERT N. DAVOREN, CHIEF OF DEPARTMENT      SIGNATURE | MARTIN F. HORN                                    SIGNATURE |

## I.   PURPOSE

To permit a Commanding Officer to adjudicate minor violations by uniformed members without resorting to formal charges and Administrative Hearings.

## II.   DEFINITION

Command Discipline is informal, non-adversarial, non-judicial punishment available to a Commanding Officer to correct minor deficiencies and to maintain discipline among uniformed members within his/her Command.

Command Disciplines are processed by Hearing Officers:

A.   Within Facilities and/or Divisions commanded by a Warden, the Warden may designate a Deputy Warden as a Hearing Officer to process Command Discipline. Otherwise the Warden shall function as the Hearing Officer.

B.   Within facilities commanded by a Deputy Warden or below, this responsibility is charged to the Commanding Officer.

C.   When a Deputy Warden is the subject of the Command Discipline, the interview shall be conducted by a Warden assigned to a different command within the same division, who shall function as the Hearing Officer.

## III.   APPLICATION

This directive applies to all pending Departmental disciplinary matters eligible for processing pursuant to this Directive. This Directive shall have no retroactive effect upon disciplinary matters which have already been disposed of pursuant to Section 75 of the Civil Service Law, negotiated settlements or by previous Command Discipline applications.

**Exhibit 9**

416R

| | EFFECTIVE DATE **12/22/05** | SUBJECT **COMMAND DISCIPLINE** | |  |
|---|---|---|---|---|
| | CLASSIFICATION # **4257R-A** | | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **8** OF **17** PAGES | |

## V.    PENALTIES (cont.)

c.    Permitting persons in unauthorized places.

d.    Prohibited or unauthorized relations or communications with persons or entities outside the Department.

2.    Schedule B

a.    Lack of punctuality.

b.    Absence without authorization for no more than one (1) tour.

c.    Unauthorized use or unsafe operation of departmental vehicles or operation in violation of law.

d.    Failure to follow procedures on count of inmates.

e.    Failure to follow procedural requirements dealing with inmate discharge, admission, transfer or lineup.

f.    Failure to report inmate infractions, where required, and any violations of rules and regulations or conduct prejudicial to good order and discipline.

g.    Failure to follow procedures regarding the reporting of unusual incidents.

h.    Failure to perform or negligent performance of routine security checks.

i.    The use of tobacco related products* within any Departmental facility, office or vehicle.

  *Tobacco related products include, but are not limited to: cigarettes, cigars, loose tobacco, chewing tobacco, and lighting materials such as matches or lighters.

3.    Schedule C

a.    Unauthorized use, possession and/or conversion of inmate and/or departmental property.

b.    Failure to safeguard inmate and/or departmental property.

c.    Failure to notify the Department of arrest and/or the disposition thereof.

**Exhibit 9-1**



| | |
|---|---|
| **EFFECTIVE DATE**<br>**12/22/05** | **SUBJECT** |
| **CLASSIFICATION #**<br>**4257R-A** | **COMMAND DISCIPLINE** |
| **DISTRIBUTION**<br>**A** | **APPROVED FOR WEB POSTING**<br>☐ YES   ☒ NO |

4TOR

| | | |
|---|---|---|
| **EFFECTIVE DATE**<br>**12/22/05** | **SUBJECT** | |
| **CLASSIFICATION #**<br>**4257R-A** | **COMMAND DISCIPLINE** | |
| **DISTRIBUTION**<br>**A** | **APPROVED FOR WEB POSTING**<br>☐ YES   ☒ NO | **PAGE 9 OF**<br>**17 PAGES** |



## V.    PENALTIES (cont.)

     d.    Failure to remain constantly alert and vigilant while on duty. Note that "sleeping on duty," rule 3.20.040, requires formal charges.

     e.    Failure to appear to answer, or having appeared, failure to answer questions relating to one's official duties.

    4.    Schedule D

     a.    Loss of shield or ID and/or failure to follow attendant procedures.

     b.    Undue familiarity and/or association with, and/or unauthorized actions on behalf of, inmates.

     c.    Failure to obey a lawful order of a supervisor, and/or treating a supervisor with contempt or disrespect.

     d.    Failure to perform, or the negligent performance of, a search of inmates, visitors, packages, and/or facility areas.

     e.    Failure to effectively supervise and safeguard inmates.

     f.    Absence without authorization for more than one (1) tour of duty but less than five (5).

     g.    Abuse of sick leave, or failure to follow procedures on attendance, including vacation and leave procedures.

     h.    Failure to exercise care in the use or safekeeping of a Personal or Departmental firearm. (Must be referred for formal charges in the first instance, but may be returned for Command Discipline in appropriate cases and processed as a Schedule D violation.)

## VI.    PROCEDURE

Form #454, "Charges, Specifications and Disposition," shall be used in all cases where a supervisor is preparing a Supervisor's Complaint Report concerning a member of his/her command, regarding violation(s) of Departmental Rules/Regulations. THE USE OF ANY OTHER FORM FOR THIS PURPOSE IS PROHIBITED. The supervisor shall complete Section #1, "Supervisor's Complaint Report," and submit Form #454 to the Hearing Officer for disposition according to the following procedure.

**Exhibit 9-2**

CHARGES AND
SPECIFICATIONS

DEPARTMENT OF CORRECTION
CITY OF NEW YORK

DATE
03/16/2021

No. B1614/2021

To COMMISSIONER OF CORRECTION
(Through Official Channels)

I Hereby Charge C.O. TROIX NELSON : # 13152 of AMKC

with

Violation of Rules and Regulations

## CHARGES AND SPECIFICATIONS

In that - XXX

1.     Said officer, on or about May 12, 2021; May 18, 2021; May 23, 2021; May 24, 2021; June 12, 2021; June 16,
2021; June 23, 2021; June 24, 2021; July 16, 2021; July 17, 2021; and July 24, 2021; and dates continuing to the
present, failed to efficiently perform his duties and engaged in conduct unbecoming of a member of the Department
in that he failed, as required, to report for his scheduled tours of duty without permission or authority and failed to
notify his command in a timely manner the reason why he failed to report for duty.

R & R # 3.05.010
R & R # 3.05.100
R & R # 3.05.110
R & R # 3.05.120
R & R # 3.10.030
R & R # 3.10.090
R & R # 3.20.010
R & R # 4.30.020

/s/ Sarena Townsend (EKY)

Sarena Townsend
Deputy Commissioner
Intelligence, Investigation and Trials Division

# Exhibit 10

DEPARTMENT OF CORRECTION
CITY OF NEW YORK

<u>09/16/2021</u>   (# B1614/2021)
(Date)

## NOTICE OF PLEADING AND HEARING

TO: <u>C.O. TROIX NELSON ;  # 13152</u>

TO:
.................................................
Facility Head

## CHARGES, SPECIFICATIONS
## NOTICE OF PLEADING AND HEARING

The charges and specifications set forth
herein are submitted to you for service upon the
member of the Department concerned.

TO: <u>C.O. TROIX NELSON ;  # 13152</u>

TAKE NOTICE that charges have been preferred against you
to the Commissioner of Correction, City of New York, and that
these charges, with specifications thereof, are as herein set
forth. You are entitled to have legal counsel at all stages of this
proceeding. Any attorney who represents you must file a notice
of appearance with the Office of Administrative Trials and
Hearings located at 100 Church Street,12th Floor, New York,
N.Y. 10007.

You have the right to file an answer to these charges within
eight days of service to the undersigned, who has been
designated as the Commissioner of the Trial Division by
direction of the Commissioner of Correction at 75-20 Astoria
Blvd - 1st Floor, East Elmhurst, N.Y. 11370-1131.

The Office of Administrative Trials and Hearings (OATH) has
rules of practice and procedure which are published in Title 48
of the Rules of the City of New York. Copies of OATH's rules
are available at the address listed above.

Your legal rights regarding these charges may be covered
under Section 75 of the New York State Civil Service Law.

_____
**Deputy Commissioner**

## ACKNOWLEDGMENT OF SERVICE

I, <u>C.O.  TROIX  NELSON ;  # 13152,</u>

understand that my signature affixed below
represents solely acknowledgment of receipt of
this document and is no way an admission of
guilt and should not be construed as an
agreement with the allegations contain herein.

I further understand that failure to sign this
document may subject me to additional formal
discipline.

I acknowledge personal service on me of the
within charges, specifications, notice of pleading
this

_____ day of _____ 20____

at _____ A.M.
P.M.

Signed: _____
(Title)   C.O #13152

Witness: _____
(Title)   C.O.I #499

_____
/s/ Savena Townsend (EKC1)
**Deputy Commissioner**

# Exhibit 10-1

**The City of New York**

Louis A. Molina, **Commissioner**

Paul Shechtman, **General Counsel**
Office of the General Counsel/Legal Division
75-20 Astoria Boulevard – Suite 305
East Elmhurst, NY 11370
718 • 546 • 0950
Fax 718 • 278 • 6001

August 22, 2023

Alicia Helbeck
Paralegal
Karasyk & Moschella, LLP
233 Broadway, Suite 2340
New York, NY  10279
ahelbeck@kmattorneys.com

    FOIL Request (Troix Nelson)
    FOIL #: 2024FR0300

Dear Ms. Helbeck:

    This is a final response to your request for records (copy enclosed) made pursuant to the New York State Freedom of Information Law.

    Enclosed is a copy of the Disciplinary Records for Termination you requested.

Very truly yours,

*/s/Stephane Plantin*
Stephane Plantin
Assistant General Counsel

Enclosure
SP/scp

**Exhibit 11**

| | |
|---|---|
| **From:** | Alicia Helbeck |
| **To:** | Records Access |
| **Cc:** | Mercedes M. Maldonado; Rinaldo, Alan; tnelson18@live.com |
| **Subject:** | [EXTERNAL] Troix Nelson - FOIL Request and Authorization |
| **Date:** | Thursday, August 3, 2023 12:25:43 PM |
| **Attachments:** | FOIL Request & Authorization - Signed 8.3.2023.pdf |

Some people who received this message don't often get email from ahelbeck@kmattorneys.com. Learn why this is important

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Forward suspect email to phish@oti.nyc.gov as an attachment (Click the More button, then forward as attachment).

Dear Records Access Officer:

Please see attached FOIL request and Authorization for the termination records pertaining to former correction officer Troix Nelson.

Thanks in advance for your cooperation.


**Alicia Helbeck**
Paralegal
**Karasyk & Moschella, LLP**
The Woolworth Building
233 Broadway, Suite 2340
New York, NY 10279
(212) 233-3800 Office
            x 103 Extension
(212) 233-3801 Facsimile
www.kmattorneys.com
ahelbeck@kmattorneys.com


Confidentiality Note

This e-mail, and any attachment to it, contains legally privileged and confidential information intended only for the use of individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender, notify sender immediately and delete it from your system. Thank you.


**Exhibit 11-1**

Troix Nelson, Plaintiff (Pro se)
1060 Sterling Place
Brooklyn, NY 11213

23-cv-10379 (JPO)

Pro Se Office
Southern District Court of NY
500 Pearl Street
New York, NY 1000
(212) 805-0175

USM P3
SDNY

RECEIVED
SDNY PRO SE OFFICE
2024 MAY 30 AM 10: 25